**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SYMONS MANUFACTURING CO., Respondent.**

**No. 14305.**

United States Court of Appeals Seventh Circuit.

March 4, 1964.

Rehearing Denied April 1, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Gladys Kessler, Attorney, N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Stephen B. Goldberg, Michael N. Sohn, Attorneys, N.L. R.B., for petitioner.

John Harrington and Albert J. Smith, Chicago, Ill., for respondent.

Before DUFFY and KNOCH, Circuit Judges, and MERCER, District Judge.

DUFFY, Circuit Judge.

National Labor Relations Board (Board) petitions for enforcement of its order issued March 18, 1963, and reported at 141 NLRB No. 48. The Board found respondent violated Section 8(a) (3) and (1) of the Act by discharging Walter Sangari because of his activities as chief union[1] steward.

Sangari was employed by respondent from May 6, 1954 to June 12, 1962, working most of that period as a welder. During that eight-year period, Sangari was never laid off nor criticized for insubordination.

In December 1961, Sangari became chief steward or chairman of the employees committee for the union. At one of the first meetings he attended as chief steward, he objected to holding a strike vote in respondent's plant. Respondent's attorney "hollered" at him "don't make small details and quit your Bolshevik aggression."

Sangari was perturbed because he felt respondent was not living up to its contract commitments. Oddo, the business representative of the union, did not raise these issues although Sangari thought he should have done so. On an occasion when Sangari sought to enlist the aid of Oddo in his disputes with the company, he was informed that Oddo was on vacation.

1. District No. 8, International Association of Machinists, AFL-CIO.

From January to June, 1962, Sangari and Joseph Shuppas, the plant manager, met frequently to discuss grievances and questions of contract interpretation which had been brought to Sangari's attention by employees. At times, members of Sangari's committee were present, but at other times they were not. There was testimony that the discussion at these meetings often became heated. During this period, only two grievances were filed by the union. Sangari filed both, one of which was for himself.

Sangari testified he proposed a warning system which the respondent installed. Also, when Sangari received his copy of the labor agreement, he raised the question of whether journeymen and maintenance men were improperly excluded therefrom. Plant manager Shuppas corrected the matter by a letter to all employees. Sangari raised the question of seniority with reference to employees who had been laid off. A series of discussions ensued on this subject which culminated in an addendum to the contract.

Sangari proposed that employees should not be required by their foreman to work different hours than the 8 to 4:30 shift provided in the labor agreement. Shuppas conceded the foreman should adhere strictly to the schedule. Sangari criticized the staggering of employees' lunch periods and Shuppas promised that this would not be repeated.

In May 1962, Sangari attended a meeting with Shuppas and time study men at which the differences between the union's and respondent's time studies were discussed. Sangari testified without contradiction that at this meeting, every time he said something, Shuppas responded "Would you please keep out of it." Shuppas told Sangari, on many occasions at their meetings, that if he didn't like how things were going, he could quit. At other times Shuppas said "This is our company, our property, if you are not happy, why not find yourself a job someplace else?" And, "if you don't like it, go." Shuppas called Sangari a trouble-maker.

On June 4, 1962, Shuppas asked Sangari if the employees would work on the following day from 7 a. m. to 3:30 p. m. because the company wanted its plant quiet and clean for an "open house party" scheduled for June 5 and 7. Sangari obtained the consent of the employees and so informed Shuppas. On the following day, Shuppas requested that the changed working hours be continued for the remainder of the week, and again Sangari obtained the employees' approval.

On June 6, Shuppas called Sangari into a foreman's office. The two were alone. Shuppas said he would like to send the men home at 11 o'clock in the morning of the following day, and he would give them a chance to make up the lost time on Saturday. Sangari said this would be a violation of the contract. Shuppas answered that he was going to send the workers home "if you like it or not." Later, after Shuppas and Sangari had been arguing, Sangari stated that " * * * the union is getting over $7,000 a year from this place, they don't do anything for you, they are leaning on your side. This is a sweetheart contract and you know it." Shuppas said he regarded the statement as a serious charge and suggested that Sangari call in a witness. None was called and further discussion on various matters continued for a period of ten or fifteen minutes.

On June 12, respondent called a meeting attended by Sangari, Shuppas, personnel director Tansey, secretary-treasurer Michalak, and stewards Williams and Kort. There was a charge made by a representative of respondent that Sangari had said the company was paying money to the union and the Federal Mediation Service. Shuppas stated that Sangari would be discharged immediately. Steward Williams suggested a lighter punishment. Sangari was then given his paychecks which had been prepared previously.

On June 18, a meeting was held to consider Sangari's grievance with reference to his discharge. Shuppas read a statement that he had discharged Sangari for making slanderous remarks. Sangari

was asked to remain outside of the conference room. He did so for an hour. Then Michalak said "Where did Sangari go, we don't want him wandering around the company talking to the employees and stirring up the employees." They then put Sangari in an office and refused to reconsider respondent's position on his discharge.

The Trial Examiner found and concluded that Sangari's discharge was clearly of a nature to discourage participation in union activities, and was motivated by respondent's hostility toward his zealous efforts as chief steward. The Trial Examiner recommended that Sangari be reinstated to his former or substantially equivalent position without prejudice to his seniority or other rights, and to be paid the wages he would have earned. The National Labor Relations Board affirmed the rulings of the Trial Examiner and adopted his findings, conclusions and recommendations.

██ The only question before this Court is whether there is substantial evidence on the record as a whole to support the Board's findings that respondent discharged Sangari because of his activities upon behalf of the union.

The mere existence of valid grounds for a discharge is no defense to a charge that the discharge was unlawful, unless the discharge was predicated solely on those grounds, and not by a desire to discourage union activity. Sunshine Biscuits, Inc. v. National Labor Relations Board, 7 Cir., 274 F.2d 738, 742.

It is very apparent that Sangari was a thorn in the side of respondent. He had played the leading role in enforcing the rights of employees under the union contract during the period he was chief steward. He received no active support from Oddo, the business agent of the union. The respondent's displeasure with Sangari's activities is shown time after time when the plant superintendent repeatedly invited Sangari to quit his job.

The conflict between Sangari and respondent appears to have reached its peak on June 6 when Sangari refused to give assent to the desire expressed by Shuppas to send the workers home at 11 a. m. instead of at the contractually prescribed time of 4:30 p. m., and that lost time be made up on a Saturday.

At the time Sangari made the remarks to which Shuppas objected, the two men were alone in a room. No one outside the room heard the statement. The meeting did not break up immediately after the statement was made. In fact, the conference continued for an additional ten or fifteen minutes. For six days thereafter nothing was heard about Sangari being discharged. Then came the meeting on June 12 hereinbefore described.

In National Labor Relations Board v. Walton Manufacturing Co., 369 U.S. 404, 405 [82 S.Ct. 853, 854, 7 L.Ed.2d 829], the Court said: "We granted certiorari * * * because there was a seeming noncompliance by that court with our admonitions in Universal Camera Corp. v. [National] Labor [Relations] Board, 340 U.S. 474 [71 S.Ct. 456, 95 L.Ed. 456]. We there said that while the 'reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view,' it may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'"

In this case, we have two fairly conflicting views. Following the admonition in National Labor Relations Board v. Walton Manufacturing Co., supra, we must and do hold that the order of the National Labor Relations Board issued March 18, 1963

Be enforced.