The GENERAL TIRE OF MIAMI BEACH, INC., the General Tire of Miami, Inc., M. O'Neil Properties, et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 20037.

United States Court of Appeals Fifth Circuit.

May 13, 1964.

D. P. S. Paul, Parker Davidson Thomson, Paul & Sams, Miami, Fla., for petitioners.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin H. Reifin, Atty., Arnold Ordman, Gen. Counsel and Melvin Pollack, Atty., N. L. R. B., for respondent.

Before TUTTLE, Chief Judge, and BROWN and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

On the basis of a finding of violations of §§ 8(a) (1) and (3), the Board seeks enforcement of its cease and desist order together with the traditional reinstatement and back pay award as to two discriminatees. We deny enforcement.

The Employer[1] is engaged in the automobile service station business with five locations in the Greater Miami area. The site of the principal activities complained of was the company station in Miami Beach. Within a day or two after the Union[2] filed a representation petition,[3] eight employees were transferred from the Miami Beach station to other locations. Within a week or so, two employees, Oliveria and Hester, were laid off. In the charge all of these actions were claimed to have been antiunion in violation of §§ 8(a) (1), if not 8(a) (3). But all that is left of the case is the charge that Oliveria and Hester were discriminatorily discharged.

That results because the Examiner, sustained by the Board over the General Counsel's exceptions, found in favor of the Employer and against the Union as to the transfers. This is highly significant in the tag-end 8(a) (3) cases. This is not because of any mechanical comparison of the rejected with asserted causes, a type of analysis we recently characterized as artificial, N.L.R.B. v. Plant City Steel Corp., 5 Cir., 1964, 331 F.2d 511. Rather, it is so because the Examiner, in effect, found no discriminatory purpose on the Employer's part. This was based on several things, all having unusual significance. Two of the transferees were found to be unmitigated perjurers largely because of the inescapable necessity of overcoming the Employer's asserted basis for their transfer —the theft of a case of lubricating oil. The upshot was that the Examiner gave them a double brand of purloiners and prevaricators. A third man, son of one of these two, was transferred to spare embarrassment to him. Another was transferred to meet a sudden shortage of personnel and still another was characterized by the Board as a "very undesirable employee." And most important, on a numbers-game theory, the Board concluded that the transfer made no sense as an antiunion weapon.[4]

1. These are the affiliated enterprises of the General Tire of Miami Beach, Inc.; the General Tire of Miami, Inc.; M. O'Neil Properties.

2. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 320.

3. The petition was filed April 28, 1960, and received by Employer on April 30.

4. The Board found: "Of eight employees shown to have signed Union cards, five were transferred and three were not; of the three who definitely took no steps to join or assist the Union, two were removed from the Miami Beach station. And of the four remaining employees, concerning whose union activities, if any, the record is silent, three remained and one went. Plainly the way in which the

**60**

■ Recognizing, as we do, that the shortcomings of a § 8(a) (1) case might not necessarily carry over to a § 8(a) (3) discharge, an analysis of this record reflects no basis for an inference that the antiunion motivation, lacking as to § 8(a) (1) transfers, was somehow present for the discharges. In the final analysis, the Board's finding of § 8(a) (3) violation rested on what was found to be the implausibility of the Employer's explanation of the layoffs. Of course that is an accepted technique in meeting the General Counsel's burden. See N.L.R.B. v. Plant City Steel Corp., 5 Cir., 1964, 331 F.2d 511. But there must be something more since an Employer may discharge for no cause, or an unfounded cause so long as it was not in the least precipitated by antiunion discrimination. N.L.R.B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 412–413.

We would have considerable doubt that we would characterize, as did the Board, the Employer's action as so unfounded as to be without any plausibility. One of the dischargees, Oliveria, had some peculiar personal mannerisms, not the least of which was a penchant for a long duck-billed haircut, and wearing dark glasses long after the sun went down. Besides, he was observed to be a little tardy in running out to service customers and devoted a lot of company time to the care of his personal motorcycle. Oliveria also had a fight on company time and premises and declined to aggressively "push" sales of preferred items. The Examiner's report recognized that Oliveria had been the subject of some concern and stated that on his transfer to Biscayne station, one manager said to another "We have one of those 'hepcats,'" the term cat being defined as "one of those 'long-haired' deals * * * more or less [referred] to * * * as the 'beatnik' stage today." Hester's disturbing preoccupation was with attractive young female customers of the station. Either in his own or the

heavy hand of transfer fell gives no support to a theory of anti-union discriminatory intent. Rather it indicates strong-

young lady's sportscar, he had taken one or more spins during working time. And on another occasion it had annoyed one of the higher management to see him get so interested in his work that he had to get in the front seat of the sportscar to properly clean off the inside of the windscreen.

We think the circumstances briefly summarized—when considered in the context of a company personnel history of some 65 transfers and 96 terminations in a short space of time—at least made the layoffs an understandable, if not justifiable, action. But we need not get that close to the brink of impermissible fact finding. N.L.R.B. v. Walton Mfg. Co., N.L.R.B. v. Florida Citrus Canners Cooperative, 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829.

The defect in the Board's conclusion stems directly from the basic weakness in the General Counsel's case. In the final analysis, the evidence of discriminatory discharge comes down to what a couple of employees said supervisor Bailey said he heard the station manager say as to the cause of Oliveria and Hester's discharge.

■■ We must avoid, of course, the easy temptation to brush all of this aside as hearsay. We have, on numerous occasions, taken pains to point out that when the fact to be proved is a word spoken, it is an uncritical error to protest as to hearsay. The verbal act, as any other act, may be proved by one who heard it, saw it, or felt it. N.L.R.B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88, 90, 92; Hendrix Mfg. Co. v. N.L.R.B., 5 Cir., 1963, 321 F.2d 100, 105; N.L.R.B. v. Globe Prod. Corp., 5 Cir., 1963, 322 F.2d 694, 696; United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319, 329; N.L.R.B. v. Tex-Tan, Inc., 5 Cir., 1963, 318 F.2d 472, 484 n. 31; Huff v. United States, 5 Cir., 1962, 301 F.2d 760; Ward v. United States, 5 Cir., 1961, 296 F.2d 898; Safeway Stores, Inc. v. Combs, 5 Cir., 1960, 273 F.2d 295.

ly that the employees' union activities had nothing to do with the Company's action."

The inquiry is not the *truth* of the words said, merely whether they were said. And frequently once the trier finds them to have been said, the words themselves carry their own death wound. N.L.R.B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88, 92.

■ But that is not what we have. What we have is: witness *A* testifies he overheard *B* state that *C* said such and such. Obviously *A* can prove what *B* said. But the decisive thing is what *C* is supposed to have said. And *A* cannot prove what *C* said by stating what *B* said *C* said. And yet, for all practical purposes, that is all we had here since *B*— Supervisor Bailey—in this barroom after-the-event discourse did not undertake, assuming he had that knowledge or position in the Company hiearchy— to state what he, rather than the station manager (*C*) had done or said.

The Board counters with the proposition that *B*—Supervisor Bailey—did not specifically deny what others attributed to him. That is not the point. He, as would be true of any other witness, could have testified to the verbal act (what the station manager said). But he did not so testify. Rather, a person further removed merely repeated what he said was said.

■ Whatever might ultimately be the technical admissibility of proof of this kind, we have no difficulty in concluding that it lacked that substantial quality on which to rest a finding of discriminatory motive in a record as equivocal as this one. In the same vein was the one isolated comment of Bailey upon which

the Board hung the § 8(a) (1) finding.

The result is that on the merits we find the order unsupported by substantial evidence on the record considered as a whole. This makes it unnecessary for us to consider the procedural challenges vigorously asserted by the Employer.

One complains of the Board's refusal to permit the Employer to prove that this was in fact not a genuine union under § 2(5), 29 U.S.C.A. § 152(5), but was a sham, a front for racketeering and extortion operated and maintained for the benefit of its officers, one of whom, Harold Gross, has since been indicted, tried and convicted for racketeering and another, Secretary-Treasurer DeRow, a witness before the Examiner, had declined to furnish information about the local's activity to representatives of the Senate Select Committee on Improper Activities in the Labor Management Field. The Examiner first refused to allow the Employer to make inquiry into, or proof on, the status of the Local. Reversal of the Examiner's point of view was short-lived as the Board on interlocutory appeal held the inquiry to be improper.[5]

The other procedural matter is the strong protest against the Examiner's permitting the Board's counsel in examining the vice president of the Employer to interrogate him as to what he had said to a Board investigator (rather than what he knew the facts to be) without displaying to the witness the memorandum or written statement obviously being used with purposeful coercive effect.[6] But our disposition of the case

5. The Board presumably followed its decision in Alto Plastics Mfg. Corp., 1962, 136 NLRB 850, in which the Board acknowledged that it was "acutely aware that testimony delivered * * * before the Senate Select Committee * * * (popularly known as the McClellan Committee), has brought to light the extent to which some individuals with highly dubious record and connections * * * have insidiously infiltrated, and gained control over, certain segments of the American labor movement for their own personal gain."

See also Imperial Reed & Rattan Furniture Co., 1957, 117 NLRB 495; Terminal System, Inc., 1960, 127 NLRB 979; The Wright Line, Inc., 1960, 127 NLRB 849; Jat Transportation Corp., 1960, 128 NLRB 780; Inyo Lumber Company, 1960, 129 NLRB 79; Chicago Pottery Co., 1962, 136 NLRB 1247.

6. The Employer's attack likens this to the Jencks rule in criminal cases, Jencks v. United States, 1957, 353 U.S. 657, 77 S. Ct. 1007, 1 L.Ed.2d 1103, partially codified

means that these matters must be postponed to another day in another case.

Enforcement denied.

in 71 Stat. 595, 18 U.S.C.A. § 3500, adopted as the Board's practice in Ra-Rich Manufacturing Corp., 1958, 121 NLRB 700, following the Second Circuit's decision in N.L.R.B. v. Adhesive Prod. Corp., 2 Cir., 1958, 258 F.2d 403. See also the Board's Rules and Regulations, 29 C.F.R. § 102.118, and Vapor Blast Manufacturing Co. v. Madden, 7

Cir., 1960, 280 F.2d 205. The Employer also stresses quite naturally our decision in N. L. R. B. v. Capitol Fish Co.. 5 Cir., 1961, 294 F.2d 868.