**TOMPKINS MOTOR LINES, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD**, Respondent.

**No. 15392.**

United States Court of Appeals
Sixth Circuit.

Oct. 7, 1964.

Clarence Evans, Nashville, Tenn., Farris, Evans & Evans, Nashville, Tenn., of counsel, for petitioner.

Seymour Strongin, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Lee M. Modjeska and Seymour Strongin, Attys., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before CECIL, O'SULLIVAN and EDWARDS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Petitioner, Tompkins Motor Lines, seeks reversal and respondent, National Labor Relations Board, seeks enforcement of respondent's order finding petitioner guilty of unfair labor practices in violation of Sections 8(a) (1) and 8(a) (4) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) and (4). Tompkins Motor Lines, Inc., 142 NLRB 1. Tompkins is a motor carrier. At its terminal in Nashville, Tennessee, it employed as a casual worker one A. J. Spain, Jr. As such, when called in, Spain worked on petitioner's loading dock and did some intracity pickup and delivery truck driving. On April 9, 1962, following its investigation of Spain's involvement in a February 22, 1962, accident while driving

one of its trucks, petitioner "grounded" Spain, i. e. his employment thereafter was limited to dock work. Petitioner contends that this was a necessary safety measure. The Board, however, ruled that the grounding was a discriminatory reprisal visited upon Spain because he had filed an unfair labor practice charge against the company following alleged discrimination against him for filing a grievance.

■ No new questions of labor law are involved in this review. Our task is to decide whether the Board's conclusion is supported by substantial evidence on the record, considered as a whole. Section 10(e) and (f), National Labor Relations Act, 29 U.S.C.A. § 160(e), (f); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). For this purpose we recite at some length the facts of the present case.

Spain's grievance, filed November 11, 1961, was heard by the "Tri-State Grievance Committee" and denied on January 16, 1962. He claimed in this grievance that he had worked the requisite hours as a casual to entitle him, under a collective bargaining agreement, to be classified as a regular employee. For a time, while the grievance was pending, he was not called in for work. There was no contractual obligation on Tompkins to call him in at any particular time, but the failure to do so was asserted to be punishment for having filed the grievance. Following the determination that Spain's grievance was without merit, the matter of his being called in was worked out in late January between Tompkins' general manager, Harrison, and an NLRB representative. Spain was thereafter called in when casual work was available. Nevertheless, on February 1, 1962, he filed an unfair labor practice charge founded on the previous failure to call him, and on April 13, 1962, the Regional Director issued a complaint. This complaint was disposed of by a settlement entered into on May 21, 1962, under which Spain was paid $325.00, presumably representing wages he would have earned had he been called in during the pendency of his grievance.

On February 22, 1962, after Spain's charge of February 1, but before the Regional Director had issued a complaint thereon, Spain was involved in an accident while driving a Tompkins truck in the City of Nashville. Spain was proceeding north in the center lane of a three-lane highway. He had observed that cars going in the same direction on his right were turning into his lane to pass a stalled car which was blocking that lane. A collision occurred when one of these cars turned into Spain's lane and, as Spain claimed, "sideswiped" the truck. Sidney A. Harrison, Tompkins' general manager, stationed in Atlanta, was advised of the accident and got reports from the insurance investigators to the effect that the accident could have been prevented by Spain had he been less insistent on his truck's right of way. The report indicated that there was an outside chance that liability would be placed on Tompkins and Spain, but that the chances of there being no liability were good.

Spain had been involved in two other accidents prior to that of February 22, one while driving a truck in Tompkins' yard, for which he was discontinued as an employee for several months, and the other while driving for another motor carrier, Roadway. This history was known to Harrison when he was considering what to do concerning Spain's third accident. On April 9, 1962, Harrison decided to ground Spain, but gave instructions that he was to be continued as a casual dock worker. In telling why he grounded Spain, Harrison stated:

> "Because I felt he was accident prone. I felt the accident he had was uncalled for and unwarranted and I felt that if we kept using him as a driver that eventually he would kill somebody or kill himself or tear up a lot of people's property."

He expressed his view that merely having and using the right of way does not have "anything to do with whether he was trying to conduct himself in a safe manner. The cemeteries are full of people that had the right of way. * * * "

Tompkins and Spain were in fact sued by the owner of the other vehicle, but on trial, held after the decision to ground Spain, the case was dismissed without indication whether dismissal followed from a finding that he had not been negligent or a finding that the other driver had been guilty of contributory negligence.

The legitimacy of general manager Harrison's concern for safety is substantiated by the experience of Tompkins Motor Lines after a change of ownership had taken place sometime in late 1958. The company, prior thereto, had had a bad safety record and shortly after the new owner took over it was charged in a United States District Court with violations of safety regulations. It pleaded guilty and was fined. Later, the company was investigated by the Interstate Commerce Commission and there was repeated inquiry into its safety record. Harrison, the man who ordered the grounding of Spain, was charged with the responsibility of improving the company's record. At the end of a later ICC hearing, had on Tompkins' application for "minor extensions" of its operations, the examiner concluded that because of improved operations under Harrison's management, a favorable finding was warranted despite a challenge to the company's fitness. This finding however, included a caveat that "applicant should be ready to present evidence consisting of future vehicle inspection reports, *its accident ratio*, court actions involving safety of operations * * * as well as other general information concerning *its safety program* in any similar proceedings at least through the calendar year 1961." (Emphasis supplied.)

The record shows that, conscious of his employer's probationary status, Harrison maintained a uniform watchfulness over the driving habits of its employees. Circumstances prevented the company from giving casual employees full safety instructions and individual attention.

But the record shows that without significant exception, every casual driver who had an accident had been not merely grounded, but discontinued as an employee by Harrison's direction. Spain, himself, had been dropped as an employee for a previous accident, even though he protested that he was not at fault. He was reinstated after some seven months. Subsequent to Spain's re-employment and while working as a driver for another employer, Roadway, he had an accident for which he was discharged. The accident of February 22 was Spain's third.[1] It is not amiss for us to assume that in addition to concern with Tompkins' probationary status, both Harrison and the ICC were concerned for the lives and safety of the general public threatened by a careless truck driver overly conscious of his "right of way." Against this background, Harrison had to determine whether Spain should be allowed to continue driving. We do not think anyone would question that the decision to ground him was valid and within the sound exercise of managerial discretion. Many, indeed, would be impressed that Harrison would have been derelict in his managerial responsibilities to have done anything less than he did, thereby jeopardizing his company's permit to do business as a common carrier and flagrantly disregarding the rights of the public. The question before us then resolves to the inquiry whether Spain's previous history as an employee and some remarks that had been made to him by some of the company's supervisory personnel insulated him from such managerial control.

Harrison, preparing to take action, was conscious of Spain's complaints and that there was then pending the unfair labor practice charge which Spain had filed on February 1, 1962. Concerned that Spain might thereby have become somehow immune to ordinary managerial control, Harrison consulted his company's attorney before taking action. Out of the consultation came the decision to ground

---

1. The fact that months later Tompkins was exonerated of liability in a civil ac-   tion is not, in our view, of controlling importance.

Spain, but to continue him as a casual employee for such work other than truck driving as might be available. Harrison thus described his action:

> "I didn't have any choice but to make the decision. I had to tell the Nashville terminal to quit using him as a driver; not to take him off the dock. \* \* \* I talked to you (Tompkins' attorney) about it before I told Nashville not to let him drive. One reason was because of this case he had pending, and you will probably recall I asked you what effect did you think it would have \* \* \* but our concern was for safety. It didn't hurt the boy by taking him off of driving. We didn't cost him any pay. I didn't have any choice. I had to take him off \* \* \* because I had rather he fight this kind of deal than to have the Commission later on, if this man has a wreck \* \* \*, that because you \* \* \* knew he was a hazard and not qualified to drive, then, we are going right back into another fitness hearing, and this time let me see you (the company's attorney) prove that you have taken the appropriate action."

The decision to ground Spain was made April 9. On April 13 the Regional Director issued a complaint on Spain's charge, pending since February 1, relating to the claimed failure to call Spain in while the grievance which had been decided against him was pending, although in January Harrison and an NLRB representative had arranged for the company to resume calling him in. As noted above, this April 13 complaint was settled on May 21. On June 11, a new charge was filed by Spain asserting that his grounding was a discriminatory reprisal for his having filed an unfair labor practice charge against Tompkins. On July 17, the Regional Director notified Tompkins that he was setting aside the May 21 settlement of the April 13 complaint because of his belief that "it had not complied with the provisions of the Settlement Agreement in Case No. 26–

CA–1217." On July 27, 1962, the Regional Director issued a so-called consolidated complaint which covered the complaint that had been settled and the June 11 charge based upon the grounding order (Case No. 26–CA–1301). After a hearing held in August, 1962, the Trial Examiner affirmed the setting aside of the settlement of May 21, finding that respondent had made the settlement in bad faith, and found the company guilty on all counts. The critical finding in his Intermediate Report was "that the accident of February 22 was not caused by Spain's negligence, that Respondent had no reasonable ground to believe that it was so caused, and that it seized on that incident as a pretext to deprive Spain of employment as a driver." His Recommended Order and "The Remedy" were sweeping in their commands, including that "Respondent be required, when work for casual or extra employees is available at its Nashville terminal, to offer such employment to Spain, *including employment as a truck driver* \* \* \* that Respondent be required to make Spain whole for any loss of pay he may have suffered \* \* \* for Respondent's refusal to employ him *as a truck driver* on and after April 10, 1962. \* \* \*" (Emphasis supplied.)

The Board sustained its trial examiner in all respects, except his finding of bad faith in Tompkins' settlement of Complaint No. 26–CA–1217. It dismissed that complaint and modified its final order accordingly, ruling that:

> "Insofar as Respondent 'grounded' Spain on and after April 10, 1962, because he had filed the grievance, Respondent violated Section 8(a) (1) of the Act, and insofar as it 'grounded' him because he had filed the charge with the Board in Case No. 26–CA–1217 Respondent violated Section 8(a) (4) of the Act."

Aside from some variance in accounts of language used by Tompkins' supervisors in talking to Spain, what was actually said and done in the events here involved is not in dispute. What Tompkins challenges is the inference of sub-

jective fact drawn by the trial examiner, and by the Board through him, that Spain's grounding was discriminatorily motivated. This inference is drawn from remarks made by dock supervisory personnel, both when Spain filed the grievance which was found to be without merit and when he filed with the Board the charge behind the complaint which was later settled. Despite testimony to the contrary,[2] the remarks made following the filing of the grievance[3] would have been sufficient to permit a conclusion that failure to call Spain in for work while the grievance was pending was retaliation for filing the grievance, in violation of Section 8(a) (1), if that charge were before the Court. As already noted, the practice of calling Spain in was resumed on January 24. After Tompkins' assistant terminal manager, one Lafayette, had been notified of the unfair labor practice charge Spain filed February 1,[4] he expressed his resentment to Spain when the latter appeared on the dock.[5]

▮▮▮ The language noted above does not seem foreign to a truck loading dock and very likely was the product of a normal, understandable impulse. Ordinarily, however, its use is a luxury which may be indulged only at the risk of unfair labor practice charges. Tompkins, however, settled the matter involving Spain's and the Board's first employment of the dock language to support a complaint against it. We do not consider that it permanently attainted whatever Tompkins did thereafter with illegality or evil motive. Neither did it insulate Spain from disciplinary action, properly taken. Standing alone, it might be sufficient to support the inference actually drawn by the Board that Spain was grounded in retaliation for filing a grievance and for later filing charges with the Board. This inference is one of fact, and the drawing of legitimate inference is within the exclusive province of the Board. N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106–107, 62 S.Ct. 960, 86 L.Ed. 1305, 1307 (1942); N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 596–597, 61 S.Ct. 358, 85 L.Ed. 368, 377–378 (1941); N. L. R. B. v. Murray Ohio Mfg. Co., 326 F.2d 509, 513 (CA 6, 1964). Section 10(e) and (f) of the NLRA, 29 U.S.C.A. § 160(e), (f), however, cast on us responsibility to determine whether such factual inferences are "supported by substantial evidence on the record considered as a whole." It is our duty to set aside a decision of the Board when we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., 340 U.S. 488,

---

2. Witnesses for Tompkins testified that the failure of Spain to get work between November 28, 1961 (after the grievance was filed on November 11, 1961) and January 23, 1962 (after Spain's grievance had been found to be without merit) was because Spain himself discontinued calling in for work.

3. Tompkins' general manager, one Horlacher, was quoted as telling Spain: "I've got this grievance that you filed and if you win it you will get less work than what you've been getting and if you lose it you will never work another day for Tompkins Motor Lines." It was also testified that when asked whether he would work Spain as a casual pending determination of the grievance, he said, "I don't know because I am still pretty unhappy about what Spain is doing in this case."

4. Spain had, in January, filed a charge against Tompkins, but withdrew it when Tompkins resumed calling him in after his grievance had been denied. However, he renewed this charge by the February 1 complaint.

5. As testified by Spain, Lafayette asked "when all this mess was going to stop" and said "if you don't stop all of this mess and get the Labor Board off of us I am not going to call you no more." Lafayette's version was that when Spain arrived on the dock after Lafayette got notice of Spain's new charge by registered letter, he asked Spain, "how much longer this crap was going on, * * * (and) told him that if he didn't cut out all of that crap, (Lafayette) was going to quit calling him."

71 S.Ct. 465. Considering the record in this case as a whole, we are convinced that Spain would have been grounded regardless of any resentment the Board might infer, and that the inference of retaliation must fall accordingly.

Inevitably, there have occurred cases where there were both just cause for discharge and evidence from which unlawful motives could be inferred. The most stringent rule announced is that discharge or other discipline is an unfair labor practice if unlawful motive played any part in the managerial decision, e. g., General Tire v. N. L. R. B., 332 F.2d 58, 60 (CA 5, 1964); N. L. R. B. v. Symons Mfg. Co., 328 F.2d 835, 837 (CA 7, 1964); N. L. R. B. v. Great Eastern Color Lithographic Corp., 309 F.2d 352, 355 (CA 2, 1962), cert. denied, 373 U.S. 950, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963). The courts that have passed on the question agree that discipline motivated entirely by a reason not proscribed by the NLRA is not an unfair labor practice merely because it coincides with anti-union sentiment. N. L. R. B. v. Lowell Sun Publishing Co., 320 F.2d 835 (CA 1, 1963); Frosty Morn Meats, Inc. v. N. L. R. B., 296 F.2d 617 (CA 5, 1961).

Even applying the rule of the most stringent cases noted above, we are satisfied that unlawful retaliation played no part in the decision to ground Spain. The record shows that in the recent period before Spain was grounded, thirteen other casual employees had been discharged because of accidents, many of which were less cause for concern than was Spain's. Additionally, it should be reiterated that Tompkins' status as a motor carrier was still precarious, and that Spain had been disciplined for two previous accidents while driving a truck. Tompkins had enjoyed good labor relations with its employees who were represented by the Teamsters Union. It was operating under a collective bargaining agreement containing a grievance procedure through which it had received and processed many employee grievances without trouble or reprisal upon any employee for filing a grievance. This record is to be weighed in appraising the real motive for grounding Spain. Compare Burke Golf Equip. Corp. v. N. L. R. B., 284 F.2d 943, 944 (CA 6, 1960); Schwob Mfg. Co. v. N. L. R. B., 297 F.2d 864, 868 (CA 5, 1962).

Reviewing the record as a whole, we are convinced not only that Spain was not discriminated against, but that he was favored because of a past history of charging his employer with wrongdoing. Other casual employees who had accidents were discharged, but he was retained as a dock employee at the same rate of pay as he would have received had he been permitted to drive.[6] We have reviewed the entire record in this case at what may appear unnecessary length in order to expose the reasons for our conclusion that the Board's finding of discriminatory purpose in grounding Spain is without substantial support.

Order set aside and enforcement denied.

EDWARDS, Circuit Judge (dissenting).

Probably no one cares much about this appeal except a contentious truck driver and the foremen who have had the dubious pleasure of supervising him. But the nature of our judicial system requires us to labor just as hard to give him his rights under the law as if thousands of people or millions of dollars were involved.

One American right is the right to complain. Occasionally one meets that difficult individual—the perpetual complainer. Frequently he is a nuisance;

---

6. There was some evidence that after grounding, Spain was receiving less work than other casual employees. There was disagreement as to the reason for this, but it was not denied that he was working elsewhere some of the time when petitioner sought to call him in for work. At the time of the hearing, indeed, he had quit calling in for work entirely. No provision of the union contract required that any casual be called in at any particular time.

and occasionally by his complaints he moves us all a little closer to justice. So in the interest of all (and of each) we maintain the right to complain. Indeed, in this instance that right has been written into law. 29 U.S.C. § 158(a) (4). The employee concerned exercised the right to complain not once, but three times. Meanwhile, he had a fairly minor accident. The company ceased to call him for truck driving work. The question posed is whether the discipline resulted from the complaints or the accident. In the first instance it would plainly be illegal. In the second, it would not.

A. J. Spain, Jr., the employee concerned in this appeal, contends that he was discharged from the petitioner's motor line because he had filed a charge before the National Labor Relations Board. Petitioner, Tompkins Motor Lines, argues on the contrary that Spain was "grounded" (not called for truck driver work) because his safety record had been something less than perfect. The National Labor Relations Board, after hearing by and recommendation of a trial examiner, found for the employee.

It should be noted at the outset that Tompkins Motor Lines has a long-standing record of labor contractual relationships which apparently were in no stage of crisis at the time of the events complained of by Spain. It also appears that petitioner had reason to be concerned about its general safety record because of an Interstate Commerce Commission directive requiring them to show some improvements. It also appears that Spain had two accidents while working for petitioner.

The first of these two accidents occurred in August of 1959. It was not a traffic accident, but involved minor damage to a tractor when Spain was seeking to hitch it to a trailer in petitioner's yard.

The traffic accident, as a result of which Spain was "grounded," involved

$20 damage to petitioner's truck and $174 to the other automobile. There were no injuries. Spain's speed at time of accident was 5–10 m. p. h. A police report exonerated Spain. The other party's suit for damages was dismissed at the end of plaintiff's case.

Petitioner, however, contends that even if the other driver was responsible, Spain could have avoided the accident by anticipating her negligent conduct.

Petitioner also argues that it followed in Spain's instance a company policy of discharge of drivers for any one accident. Testimony of a number of other drivers who had accidents and had not been discharged made it clear, however, that this policy related to "chargeable" accidents, i. e., where the driver was deemed at fault.

As we have seen, the fault involved in Spain's accident of February 2 was based on a quite subjective evaluation.

However this evidence be read, there are two undisputed episodes in this record which lend weight to the Board's position. After Spain had filed NLRB charges (claiming discrimination in call-in practice because of a union grievance filed by him),[1] two of petitioner's supervisors made specific threats in relation to him based on the NLRB charges.

Spain relates the first one in this testimony:

"Q.   (By Mr. Raney)   What was said in this conversation between you and Mr. Horlacher?

"A.   He took his hand and started pointing toward his shirt pocket and said, 'I've got this grievance that you filed and if you win it, you will get less work than what you've been getting and if you lose it you will never work another day for Tompkins Motor Lines.'

"Q.   Was there anything in his shirt pocket?

1.   This first NLRB proceeding was "settled" by a payment of $325 to Spain and withdrawal of the complaint. It was understood at that conference, however, that Spain intended to (and was free to) file the present charge.

"A. Yes, sir, he had the grievance folded up in his pocket."

The second episode follows:

"Q. (By Mr. Raney) Have you heard any comments by any Company officials or supervisors concerning this charge?

"A. Yes, sir. After that I went out—Bill Lafayette called me to work one morning and I went to and Bill Lafayette came up to me and asked me when all this mess was going to stop. I asked him, 'What mess,' and he said, 'All this mess of the Labor Board.' I said, 'Well, my lawyer is handling that.' He said, 'No, A. C. Sloan is behind all of it,' and I said, 'No, my lawyer is behind it,' and he said, 'Well, if you don't stop all of this mess and get the Labor Board off of us I am not going to call you no more.'"

The Board found that the company violated Section 8(a) (1) and 8 (a) (4) of the Act by dint of these threats and the subsequent failure to call the employee for truck driver work, which failure they infer to have been due not to reasonable enforcement of safety regulations, but to retribution against the employee for filing the NLRB grievance.

The applicable language of § 8(a) (4) is, "[I]t shall be an unfair labor practice for an employer—to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this act."

Our question on review is whether or not on the whole record there was substantial evidence to support the Board's conclusion that Spain had been discriminated against because he filed charges under the National Labor Relations Act. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456 (1951).

We do not review the facts in this record *de novo*. The National Labor Relations Board has been given the duty of finding facts. 29 U.S.C. § 160(e). Drawing of legitimate inferences from such facts is also its exclusive province. N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960 (1942).

In Universal Camera Justice Frankfurter defined this court's function thus:

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., supra, 340 U.S. at 488, 71 S.Ct. at 465.

There is evidence in this record to justify the court's conclusion that the disciplinary measures taken against this employee were based on safety considerations. And I share the court's concern for maintaining management's right to demand high standards of employee safety in highway driving.

It is, however, impossible for me to read this record without finding substantial evidence also to support the NLRB's conclusion that the real reason behind the disciplinary measures taken was this employee's filing of the successive complaints.

It would appear to me that the Board made a "choice between two fairly conflicting views."

I would deny the petition to review and grant enforcement of the Board's order.