NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ADVANCED BUSINESS FORMS COR-
PORATION, Respondent.

No. 145, Docket 72–1332.

United States Court of Appeals,
Second Circuit.

Argued Nov. 9, 1972.

Decided Jan. 3, 1973.

Bertram T. Kupsinel, Atty., NLRB, Washington, D. C. (Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert A. Giannasi and Alan D. Cirker, Attys., NLRB, Washington, D. C., on the brief), for petitioner.

Alfred T. DeMaria, New York City (Kirlin, Campbell & Keating, New York City, on the brief), for respondent.

Before FRIENDLY, Chief Judge, MANSFIELD and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

 This petition to enforce an order of the National Labor Relations Board, 194 N.L.R.B. No. 52 (1971), is another instance where the Board's order in large measure is not challenged. Of the numerous provisions of the trial examiner's recommended order of August 17, 1971, adopted by the Board on November 24, 1971, less than 20% are challenged by the Company in the proceedings on the instant petition by the Board to enforce its order.[1]

---

1. This case is a striking illustration of the desirability of amending Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1970), to provide that an order of the Board shall become effective within a reasonable period after it is issued *unless* a petition to review is filed by an aggrieved person pursuant to Section 10(f) of the Act. See Friendly, Federal Jurisdiction: A General View, Part IX (Carpentier Lectures, Columbia University School of Law, November 13–16, 1972, to be published by the Columbia University Press in January 1973); and see 1 Recommendations and Reports of the Administrative Conference of the United States, Recommendation No. 10 and pp. 238–67 (1970).

In the instant case, the violations to which the Board's order is directed occurred during a period of 17 to 27 months ago. Aside from the fact that approximately 80% of the Board's order is not challenged, the Company informs us in its brief that "[b]argaining with the Union has resumed and numerous negotiating sessions have taken place", and that "[d]uring the pendency of this appeal . . . the Company has ceased operations due to its financial inability to continue operations and, therefore, no longer operates the business corporation involved in this appeal." This does not render the case moot, however, because the Company's liability for back pay for Fasano and the replaced strikers is dependent upon our decision.

In connection with the Company's statement that it has gone out of business, the record shows that the Company (Advanced Business Forms Corporation) was a wholly owned subsidiary of Retrieval Control Systems, a publicly held company whose president, John Montague, participated actively on behalf of Advanced Business Forms Corporation in the collective bargaining negotiations referred to in this opinion below.

The petition before us presents only two essential issues by virtue of the Company's[2] limited challenge of the Board's order:

(1) Whether there was substantial evidence to support the Board's determination that the Company violated Section 8(a)(3) of the Act[3] in discharging employee Barbara Fasano because of her union activities.

(2) Whether there was substantial evidence to support the Board's determination that the Company violated Section 8(a)(5) of the Act in failing to bargain collectively in good faith with the Union.[4]

For the reasons stated below, we hold that there was substantial evidence to support the Board's determination on issue (1), but not on issue (2). We enforce the Board's order in all respects, except that we deny enforcement as to those provisions of the order dependent upon the Board's finding of a violation of Section 8(a)(5).[5]

### I.

The essential facts as found by the trial examiner may be summarized as follows.

The Company, a New York corporation, operates a small printing plant at Ronkonkoma, New York. It is engaged in the printing, sale and distribution of business forms and related products. Prior to early February 1971, its president was James Orrach. It is a wholly owned subsidiary of Retrieval Control Systems, the president of which is John Montague.

One department of the Company—the pressroom and preparatory department (referred to together as the prep department)—is at the center of this controversy. This department does the art work and photography for the Company, and makes the plates that are run on the presses. The size of the department fluctuates between 11 and 14 employees.

Prior to September 1970, the prep department did not have union representation. Two department employees, who apparently were angry with management, arranged for a meeting on September 12 with Julius Seide, a business representative of the Union. Nine prep department employees attended the meeting. Some of them signed union bargaining authorization cards.

On September 16, Seide filed with the Board's regional office a petition for certification as the bargaining representative of the employees of the Company's prep department. A copy of the petition was served on the Company on September 18. That same day, four pressmen—Walter Yarosz, Eugene Sannuto, Joseph Kirklewski, and Carl Piscani[6]—were laid off.[7] All four had attended the September 12 meeting and had signed union authorization cards. Arthur Kunzweiler, supervisor of the prep department, participated in the decision to lay off the men. At the hearing he admitted being aware at the time of the discharge that the four men were union sympathizers.

On October 13, Seide and President Orrach entered into an Agreement for Consent Election which provided that the Board's regional director would conduct an election on November 4 among the prep department employees. In the afternoon of October 13, Orrach called a meeting of all prep department employees.

---

2. Advanced Business Forms Corporation (the Company).

3. National Labor Relations Act, 29 U.S.C. § 151 et seq. (1970) (the Act).

4. New York Printing Pressmen & Offset Workers Union No. 51, International Printing Pressmen and Assistants' Union of North America, AFL–CIO (the Union).

5. A summary of the provisions of the Board's order and the Board's determinations, including those not challenged by the Company, are set forth below at pp. 462–463.

6. The termination of Piscani was never involved in this case.

7. Two of the employees—Kirklewski and Sannuto—were reinstated on November 16 and 30, respectively.

At the meeting, he stated that the Company did not really want the Union, "that he thought they had a pretty good company, they had pretty good benefits, and if anybody had any gripes they should have come to him and discussed them." Similar statements were made at another meeting called by Orrach on October 30, five days before the election.

As the election approached, the Company's tactics in opposition to the Union became more questionable. On November 2, Orrach and Kunzweiler threatened employee George Najdek as he was operating one of the presses. While checking the operation of Najdek's press, which apparently was not functioning properly, Orrach told Najdek that "[i]f the Union gets in, I will have to lay you off." Orrach also reminded Najdek to attend a Union meeting scheduled for that evening. Seide conducted the scheduled Union meeting that evening at a local tavern. While it was in progress, Orrach entered and sat at the bar. After a short while, Seide approached Orrach and spoke to him briefly. Shortly thereafter Orrach left the premises. The next day, Orrach talked with Kunzweiler on the plant floor in the prep department within the hearing of Najdek and another employee, Barbara Fasano. In the course of the conversation, Orrach stated that "[a]nyone seen at the meeting last night won't be here for long." After making the statement, Orrach turned and grinned in Fasano's direction, indicating that the remark applied to her.

The election was held as scheduled on November 4. It resulted in 7 votes for the Union, 3 against, and 1 challenged ballot.[8] That evening after work several employees celebrated the Union victory at a local bar. Orrach entered the bar and insulted the celebrants.[9] He then approached Fasano and asked her why she had voted for the Union. When Fasano replied that she believed that it was right, Orrach argued with her, asking, "What did you think you would benefit out of it?" and, "If you want more pay, why didn't you ask me? How much do you want? Fifty dollars?" At a later date, November 16, Orrach remarked to two other employees that he would "get rid of the people one by one, all the people that try to hurt him and all the people that voted for the Union."

On November 6, the Company instituted several changes which adversely affected the working conditions of the employees.[10] These changes were made without notification to or bargaining with the Union. On the same day, Najdek was laid off. On November 11, eight employees, including Fasano, called in sick to protest Najdek's discharge. When Fasano returned to work the next day, Kunzweiler made sarcastic comments about her absence. On November 20, Fasano was discharged. The circumstances surrounding her discharge will be discussed more fully below.

On November 19, the Company and the Union began negotiations for a collective bargaining agreement. At the outset, Company negotiators Orrach and Ralph Bartell[11] informed Union negotiator Seide that any agreements reached would have to be ratified by John Mon-

8. Thereafter, on November 18, the Board's regional director certified the Union as the bargaining representative for the prep department employees.

9. Among other insults, Orrach shouted to the bartender, "Don't serve these queers."

10. Employees lost the privilege of listening to the radio in the darkroom; the lunch period was moved to an inconvenient time; outside telephone calls no longer could be made from the plant telephone, nor could incoming calls be received on the plant telephone; and strippers in the prep department for the first time were required to maintain time sheets for every job performed. The Board found that each of these changes in working conditions were in violation of § 8(a) (3) and (1), including the last item as to which the Board reversed the trial examiner. See note 14 *infra*.

11. Bartell was employed by the Printing Industries of Metropolitan New York, Inc., an association of employers that negotiates an association-wide contract on behalf of its members. In the instant negotiations, however, Bartell acted solely as a negotiator for the Company and not for the association.

tague, president of the parent company. A form of association contract used by Printing Industries of Metropolitan New York, Inc. served as the basic framework from which the parties negotiated. At bargaining sessions held on December 2, 22 and 28, and January 28, 1971, the parties discussed and reached tentative agreement on most of the economic terms such as wage increases. At the December 28 meeting, the Company requested a maintenance-of-membership clause in lieu of the union security clause contained in the standard association contract.[12] This became the main point in dispute between the parties; the Union insisted on the union security clause and the Company was firmly opposed to it.

Prior to the next bargaining session on March 12, 1971, Orrach was relieved of his duties as president of the Company. Montague replaced him in the negotiations. Montague apparently had been kept informed of the progress of the negotiations. The parties met again on April 8 and 16. At the April 16 meeting, Seide proposed a compromise union security plan. Montague wanted to reject the compromise immediately. At Bartell's suggestion, however, they requested time to consider the compromise plan.

On April 21, Bartell called Seide and told him, "We have a contract. We got to get together and work out all of the details." Seide and Bartell met on April 23 and drew up a handwritten document setting forth all the tentative agreements theretofore reached, as well as the compromise union security provision as proposed by the Union. They arranged to meet with Montague on April 27 to review and to sign the contract. When Seide arrived at Bartell's office on April 27 for the scheduled meeting, Bartell informed him that he had just received a telephone call from Montague who had stated that he would not sign "any contract".[13]

On April 30, Seide informed several employees that Montague had refused to sign a contract. Seide concluded that they had no alternative but to strike. On May 3, an undisclosed number of employees did go on strike. On May 14, while the strike was in progress, the parties, at the request of the Suffolk County Labor Commissioner, met at the Commissioner's office for further negotiations. After some persuading by the Commissioner, Seide renewed the compromise union security proposal in order to get a signed contract. Montague consulted with his employees and informed the Union that he would not agree to the compromise proposal. For aught that appears in the record before us, no collective bargaining agreement was ever signed.

An evidentiary hearing was held before a trial examiner at Brooklyn, New York, on May 17 and 18, 1971. The hearing resulted from various charges filed by the Union and certain employees against the Company during the period from November 23, 1970 to February 22, 1971, followed by the filing of various pleadings which in turn were consolidated and amended from time to time through the hearing itself.

On August 17, 1971, the examiner filed his decision which included findings of fact, conclusions of law and a recommended order. He found that the Company had violated § 8(a)(1) of the Act by threatening employees with discharge

12. Under a maintenance-of-membership clause, all employees who are members of the union at the time the bargaining agreement is entered into, and those who of their own volition thereafter become members, are required, as a condition of employment, to maintain their union membership for the duration of the agreement. Employees are not required, however, to join the union. On the other hand, the union security clause contained in the standard association contract made union membership compulsory.

13. We discuss below in more detail the question whether there was substantial evidence to support the Board's determination that this statement by Montague indicated a refusal to enter into any agreement or a refusal to sign the particular contract with the union security clause in it.

or other reprisals because of their union activities, coercively questioning employees concerning their union sympathies, and engaging in surveillance of employee union activity; that the Company had violated § 8(a)(3) and (1) of the Act by discharging employees Yarosz, Kirklewski and Sannuto on September 18, Najdek on November 6, and Fasano on November 20 because of their union activities, and by instituting adverse changes in working conditions after the union election in retaliation against the employees voting for the Union; that the Company had violated § 8(a)(5) and (1) of the Act by unilaterally instituting adverse changes in employment conditions and by its conduct in the collective bargaining process of repudiating on April 27 all agreements reached by the parties through several months of bargaining; and, finally, that the May 3 strike was caused by the Company's refusal to bargain in good faith and its other unfair labor practices.

On November 24, 1971, the Board filed its decision and order, 194 N.L.R.B. No. 52, which affirmed the rulings, findings and conclusions [14] of the trial examiner and adopted his recommended order. The order required the Company to cease and desist from the unlawful conduct found and from in any other manner discriminating against employees or interfering with, restraining or coercing them in the exercise of their statutorily protected rights. The order affirmatively required the Company to offer reinstatement to the discriminatorily discharged employees and to make them whole; upon application, to offer full reinstatement to the employees who struck on May 3, 1971, and to make them whole; upon request, to bargain collectively with the Union in good faith; to restore any of the employment conditions which were unlawfully changed after the election; and to post appropriate notices.

In view of the substantiality of the supporting evidence, the Company understandably did not take exceptions to the examiner's findings, and of course does not challenge the Board's determinations, that the Company violated § 8(a)(1) by threatening and coercively questioning employees, and by surveilling their union activity; that it violated § 8(a)(3) and (1) by discharging employees Yarosz, Kirklewski, Sannuto and Najdek, and by making adverse changes in working conditions after the election; or that it violated § 8(a)(5) by making adverse changes in the employee's working conditions without consulting the Union.

■■■ The Company's efforts coercively to discourage its employees from voting for the Union were numerous and flagrant, and were amply supported by the proof before the examiner. It is equally clear that the discharge of the employees named above, without apparent lawful reason, shortly after they had performed acts in support of the Union, and following threats of discharge for Union activity, constituted violations of § 8(a)(3). NLRB v. Scoler's Inc., 466 F.2d 1289, 1291–92 (2 Cir. 1972). And there can be no doubt that the changes made by the Company in employee working conditions were made without Union participation in violation of § 8(a)(5).

The Company does challenge, however, the Board's determinations that Barbara Fasano was discriminatorily discharged in violation of § 8(a)(3), and that the Company failed to negotiate in good faith on the collective bargaining agreement in violation of § 8(a)(5). To these provisions of the Board's order, we now turn.

## II.

■■ Section 8(a)(3) of the Act makes it unlawful for an employer to discourage or to encourage membership in any labor organization by discrimination in regard to hire or tenure of employment, or any term or condition of employment. The critical question un-

14. The Board reversed only the examiner's determination that the Company had not violated § 8(a)(3) and (1) by requiring after the election that prep department strippers keep time sheets for every job performed. See note 10 *supra*.

der this provision is what motivated the employer to discharge or otherwise change the employment conditions of the employee. NLRB v. Melrose Processing Co., 351 F.2d 693, 697–700 (8 Cir. 1965). Section 8(a)(3) does not deny an employer the right to discharge an employee for genuine economic reasons or for unsatisfactory work performance. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45–46 (1937). The existence of a valid ground for discharge is not sufficient, however, if it was merely a pretext or if the discharge was based in part on an unlawful ground. NLRB v. Dorn's Transportation Co., 405 F.2d 706, 713 (2 Cir. 1969); NLRB v. Pembeck Oil Corp., 404 F.2d 105, 109–10 (2 Cir. 1968), *vacated on other grounds and remanded sub nom.* Atlas Engine Works, Inc. v. NLRB, 395 U.S. 828 (1969).[15]

The issue here is whether there was substantial evidence to support the Board's conclusion that Fasano's discharge was motivated at least in part by the Company's discrimination because of her union activities. See Universal Camera Corp. v. NLRB, 340 U.S. 474, particularly at 476, 491–92 (1951); NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34–35 (1967). In reviewing a decision of the Board on this issue, we have said that its ruling on motivation "cannot lightly be overturned". United Aircraft Corp. v. NLRB, 440 F.2d 85, 91–92 (2 Cir. 1971); NLRB v. Gladding Keystone Corp., 435 F.2d 129, 131–32 (2 Cir. 1970). We hold that the Board's decision here was based on substantial evidence.

The Company introduced at the hearing some evidence which indicates that Fasano was an inefficient and insolent employee. She was hired on September 29, 1970, shortly after the Union established its first foothold in the Company. She was hired to make plates and to operate the cameras. Although she performed well during the first few weeks of employment, her performance deteriorated thereafter. She spoiled an unusually high percentage of the plates on which she worked.[16] She required more supervision than an average employee. While she never actually refused to work, she, unlike other employees, often had to be ordered to perform her work. We believe that Fasano's conduct, while an adequate ground for discharge, was not so intolerable as to demand it. NLRB v. Park Edge Sheridan Meats, Inc., 341 F.2d 725, 728 (2 Cir. 1965). Moreover, there was sufficient evidence to provide a reasonable basis for inferring that in fact this ground alone did not lead to her discharge.

Fasano was actively involved in promoting the Union. She attended the November 2 organizational meeting of the Union which was interrupted by the appearance of Orrach. She voted for the Union on November 4. When Orrach asked her at the victory celebration that night why she did so, she explained that she felt that it was "right". On November 11, she and seven other employees called in sick to protest the discharge of Najdek. Her supervisor, Kunzweiler, knew of her participation in the "sick-out". The Company certainly was aware of her strong support of the Union. NLRB v. Pembeck Oil Corp., *supra,* 404 F.2d at 110.

Several facts disclosed by the record support the Board's conclusion that the Company was motivated by antiunion considerations in discharging Fasano. On November 3, within her hearing and presence, Orrach threatened to discharge employees who had attended the Union meeting the previous evening. His glance toward Fasano and "little grin"

15. The consequences to an employee of being discharged under the pretext of poor work performance are too serious to allow the discharge to stand when an improper motive entered into the employer's decision to discharge. Moreover, other employees —particularly those barely holding their jobs—are likely to be discouraged from supporting a union if they reasonably believe that it will cost them their jobs.

16. In operating a platemaker, which burns a negative onto a plate, it is possible to "spoil" a plate so that it cannot be used in the presses. Each spoiled plate cost the Company between $3.20 and $5.50.

indicated that she in particular was to be a target of the Company. Following the Union election on November 4, Orrach questioned and argued with her about her support of the Union. On November 12, the day after the sick-out, Kunzweiler made sarcastic remarks about her participation in that protest. For example, he instructed her to perform her job if she was not "too sick today". We believe this indicated that the Company intended to watch Fasano's work extra-carefully in order to find a pretext on which to discharge her. On November 16, Orrach warned two other employees that he would "get rid of" Union supporters. Four days later Fasano was discharged. "The abruptness of a discharge and its timing are persuasive evidence as to motivation." NLRB v. Montgomery Ward & Co., 242 F.2d 497, 502 (2 Cir.), *cert. denied*, 355 U.S. 829 (1957). The closeness in time of Orrach's threat and Fasano's discharge strongly suggests that the latter was the effectuation of the former. Finally, the Company's numerous other unfair labor practices designed to defeat unionism support the inference that Fasano's discharge was for union activity. NLRB v. Midtown Service Co., 425 F.2d 665, 671 (2 Cir. 1970).[17]

We hold that there was substantial evidence to support the Board's determination that the valid grounds for discharge asserted by the Company were not alone the cause of Fasano's discharge, and that her discharge was motivated at least in part by unlawful discrimination on the part of the Company.

### III.

Section 8(a)(5) of the Act makes it unlawful for an employer "to refuse to bargain collectively with the representatives of his employees." Collective bargaining is defined in § 8(d) as "the mutual obligation . . . to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . ." The Act does not require that an employer yield a position fairly maintained, NLRB v. Herman Sausage Co., 275 F.2d 229, 231 (5 Cir. 1960), or that the parties actually reach an agreement. NLRB v. Israel Putnam Mills, 197 F.2d 116 (2 Cir. 1952).

The issue before us is whether there was substantial evidence to support a conclusion either that the Company in its collective bargaining negotiations engaged in a specific practice which constitutes a *per se* violation of § 8(a)(5) or that the Company's entire course of conduct in the negotiations clearly shows a lack of good faith. We hold that there was not sufficient evidence to support either conclusion.

A *per se* violation of § 8(a)(5) may occur when a company misleads the union into believing that an agreement has been reached as to the terms of a collective bargaining contract and only formal execution remains, NLRB v. Mayes Bros. Inc., 383 F.2d 242 (5 Cir. 1967); or when an employer has reached a complete agreement with the union and its refusal to sign frustrates the whole concept of collective bargaining, H. J. Heinz Co. v. NLRB, 311 U.S. 514, 523–26

---

17. The Company cites several decisions for the proposition that evidence of an employer's general hostility to a union does not support a finding that an individual discharge was in violation of § 8(a)(1) and (3) of the Act. NLRB v. Shepherd Laundries Co., 440 F.2d 856 (5 Cir. 1971); NLRB v. Monroe Auto Equipment Co., 368 F.2d 975 (8 Cir. 1966). The thrust of such decisions is that an employer's general antiunion policy, *without more*, does not prove an unlawful motive as to a specific discharge. It is clear in the instant case that the Company's general antiunion animus was only one of several facts which indicate an improper motive for the discharge of Fasano.

(1941).[18] The Board here determined that the Company violated § 8(a)(5) when on April 27, Montague, acting for the Company, refused to sign a written contract embodying the tentative agreements reached over six months of negotiations and thereby indicated a refusal to enter into any agreement at all with the Union. In support of this conclusion, the Board relied primarily upon evidence that on April 27 Montague said he would not sign "any contract".

In our view, the Board attributes unjustifiable significance to this vague and ambiguous statement by Montague. Moreover, the events which occurred before and after this statement indicate that the reasonable interpretation of it is that the Company was refusing to sign the proposed agreement merely because it contained the union security clause. Montague refused to sign "any contract" with a union security clause. The Company had bargained in apparent good faith for months before this statement. It had reached agreement with the Union on most of the economic issues. At the same time, the Company consistently had opposed the union security clause. This lends support to the conclusion that it was this clause that caused Montague to reject the specific contract proposed by the Union. Indeed, when the parties continued negotiations after April 27, the only provision in dispute was the union security clause. Seide's testimony also severely undermines the Board's conclusion. He testified at one point that Montague had merely refused to sign the particular contract that had been prepared. He also testified that he understood that Montague had refused to sign the contract because one of his employees refused to join the Union under any circumstances. We fail to find substantial evidence to support the Board's decision that this statement was a repudiation of six months of bargaining and an absolute refusal to sign any contract.

There was some testimony that the Company had reached an oral agreement with the Union on the union security clause·issue, and then repudiated its agreement. The courts have not yet established whether such conduct alone is sufficient to support a finding that a company has refused to bargain in good faith. This is not a situation such as that in NLRB v. Industrial Wire Products Corp., 455 F.2d 673 (9 Cir. 1972), where the company repeatedly changed its mind on various provisions that had been agreed on. We believe that repudiation of an agreement on a single issue, without more, does not under the circumstances presented here manifest a lack of good faith. In any event, the record here does not show that the Company reached an agreement, oral or otherwise, on the union security clause issue. Bartell was the only negotiator for the Company to indicate agreement on that issue. But he did not have the authority to bind the Company. We do not agree with the Board that Montague must have approved the compromise proposed before Bartell would tell Seide that they had "a contract". Bartell may well have acted on his own or misunderstood Montague. We find insufficient evidence to support the Board's conclusion that the Company reached an agreement with the Union on the security clause issue.

We recognize of course that a company's "entire course of conduct" or "the totality of the circumstances" may show a lack of good faith in violation of § 8(a)(5), although none of its specific acts amounted to proscribed conduct. NLRB v. Fitzgerald Mills Corp., 313 F.2d 260, 264–67 (2 Cir.), cert. denied, 375 U.S. 834 (1963); NLRB v. Industrial Wire Products Corp., supra, 455 F.2d at 677–78. The appropriate standard is whether the circumstances clearly indicate "a desire not to reach an agreement with the union". NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1

---

18. Other examples of proscribed tactics that constitute a *per se* violation of § 8(a)(5) are set forth by Judge Friendly in NLRB v. General Electric Company, 418

F.2d 736, 767 (2 Cir. 1969) (dissenting opinion), cert. denied, 397 U.S. 965 (1970).

Cir. 1953), *cert. denied,* 346 U.S. 887 (1953). Here there was not sufficient evidence from which it fairly could be concluded that the Company had no intention of reaching an accord with the Union.

The Company's unfair labor practices did show resentment and hostility toward the Union. We have held that evidence of general antiunion animus is admissible to prove lack of good faith in the collective bargaining process. NLRB v. Patent Trader, Inc., 415 F.2d 190, 197 (2 Cir. 1969). But here the Company's apparent cooperation and sincere efforts in the contract negotiations demonstrated that the Company did not allow its dislike for the Union to affect its conduct at the bargaining table. Accordingly, we believe that its unfair labor practices carry little, if any, weight in proving a violation of § 8(a) (5).

The Company was represented in the negotiations by a person who did not have authority to enter into a binding agreement. While a company has the right to conduct negotiations in this way, the use of a negotiator without authority to bind the company is some evidence of a lack of good faith. NLRB v. Coletti Color Prints, Inc., 387 F.2d 298, 304 (2 Cir. 1967). We have held, however, that it requires more than proof that the bargaining representative of the company was not empowered to enter into a binding agreement to support a determination that the Company violated § 8(a)(5). NLRB v. Fitzgerald Mills Corp., *supra,* 313 F.2d at 267.

Finally, the Company adamantly refused to agree to the union security clause despite the Union's willingness to compromise on that provision.

It sometimes may be necessary for the Board or a court to examine the reasonableness of the parties' positions on specific issues to determine whether, under all the circumstances, a particular bargaining position was taken to frustrate negotiation generally and thus to prevent agreement. NLRB v. Reed & Prince Mfg. Co., *supra,* 205 F.2d at 134. By the express terms of § 8(d) of the Act, the obligation to bargain "does not compel either party to agree to a proposal or require the making of a concession". NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 402–04 (1952). A party thus is entitled to stand firm on a position if he reasonably believes that it is fair and proper or that he has sufficient bargaining strength to force agreement by the other party. See NLRB v. General Electric Co., 418 F.2d 736, 766–70 (2 Cir. 1969) (Friendly, J., dissenting), *cert. denied,* 397 U.S. 965 (1970). The Board of course cannot ignore a patently unreasonable position. Moreover, if other circumstances indicate that a party was determined not to reach an agreement, the Board may consider the reasonableness of his positions on particular issues to determine whether he was attempting to frustrate negotiation. Neither of these situations, however, is present here. We find insufficient evidence to establish lack of good faith bargaining by the Company, as indicated by the totality of the circumstances.[19]

We hold that there was not sufficient substantial evidence to support the Board's determination that the Company failed to bargain collectively in good faith with the Union.

We enforce the Board's order in all respects, except that we deny enforcement of paragraphs 1(b), 2(b) and 2(e) of the order.

19. The Board concluded that the strike beginning May 3, 1971 was an unfair labor practice strike caused by the Company's refusal to bargain collectively in good faith and the Company's other unfair labor practices. We disagree. Since we have held that there was insufficient evidence to support the Board's determination that the Company refused to bargain collectively in good faith, the only possible remaining peg for the Board's

finding of an unfair labor practice strike were the Company's "other unfair labor practices". We find no evidence which indicates that the unfair labor practices six months before the strike played any part whatsoever in the decision to strike. We hold that the Board's finding of an unfair labor practice strike is not supported by substantial evidence and we decline to enforce that part of the Board's order based upon such finding.