NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PARK EDGE SHERIDAN MEATS, INC.,
Respondent.

No. 261, Docket 29125.

United States Court of Appeals
Second Circuit.

Argued Dec. 16, 1964.

Decided Feb. 16, 1965.

Morton Namrow, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Atty., Washington, D. C.), for petitioner.

Ludwig Teller, New York City, for respondent.

Before FRIENDLY, HAYS and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

In N. L. R. B. v. Park Edge Sheridan Meats, Inc., 323 F.2d 956 (2 Cir. 1963), we enforced an order of the National Labor Relations Board, 139 N.L.R.B. 748 (1962), finding respondents guilty of various unfair labor practices in 1961 with respect to efforts of Local 34, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, to organize employees in two supermarkets near Buffalo, N. Y. operated by corporations controlled by the Benatovich family. Union activity was dormant for a year after the unsuccessful strike of June, 1961, which is recounted in that opinion. It was resumed in July, 1962, at the Sheridan store under the leadership of a butcher named Rodeghiero. On November 7 the Regional Director ordered an election as to that store, which was held on December 6. On November 5 respondents discharged Rodeghiero, under circumstances later described.

The union immediately filed a charge alleging that the discharge was discriminatory and also, in completely general terms, that "on or about November 5, 1962, and at all times thereafter" respondent had interfered with its employees' § 7 rights. A second charge, alleging a discriminatory transfer of another employee and repeating the general language of the first, was filed after the union's loss of the election. Having conferred with Rodeghiero, the Regional Director dismissed the portion of the first charge concerning him, as he likewise did as to the discriminatory transfer alleged in the second; however, his decision as to Rodeghiero was overturned by the General Counsel and a complaint ultimately issued which alleged various unfair labor practices in addition to the discharge of Rodeghiero. The proceeding was consolidated with a hearing ordered by the Regional Director on two of the union's objections to the election because of the same unfair labor practices.

[1] The trial examiner found that the credible evidence failed to sustain the complaint or the objections and recommended that the complaint be dismissed and the objections overruled. On exceptions by the General Counsel and the charging party, a three-man panel of the Board held that Rodeghiero had been discharged for union activity, found an unlawful no-solicitation rule and three other instances of unlawful interference, by surveillance and interrogation, and concluded that the employer's conduct warranted setting the election aside. One member dissented as to Rodeghiero's discharge. The questions before us on the Board's petition for enforcement are factual; the issue is whether the record "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). We think this a case where it does.

■ Even the Board's statement of the events of 1962 shows a marked diminution both in the quantum and in the intensity of anti-union activity from 1961. This change was neither an accident nor the result of a sudden increase in the Benatoviches' affection for the union. Having apparently learned a lesson from the prior proceeding, the respondents engaged an experienced labor attorney who endeavored to keep their conduct within what he considered the range permitted by law. We would not be misunderstood as saying that advice of counsel, even if precisely followed, is a defense to an unfair labor practice charge. See Welch Scientific Co. v. N. L. R. B., 340 F.2d 199 (2 Cir. 1965). But when a party that has erred in the past places itself in the hands of capable counsel who gives reasonable advice for the future, and there is a significant improvement in its conduct, it ought not be viewed as having such a propensity for sin that every episode is given the worst interpretation, or be condemned by indiscriminate repetition of the phrase that its conduct "must be assessed against the background of its earlier unfair labor practices. * * * "

The issue most sharply contested, whose resolution has a bearing on the others, was the discharge of Rodeghiero. The trial examiner found that in mid-September he was called into the office of Hyman Benatovich who warned him about any more "union talking on the company premises" on Rodeghiero's version, or "disturb[ing] the other people" on Benatovich's, a conflict which the examiner did not resolve; that, in early October, Hyman told Rodeghiero that a "couple of girls" had made statements against him for which he could be fired; and that, on October 23, four days after Rodeghiero had testified in the representation proceeding, Hyman called him into his office, where two girl employees accused him of calling them "rebels" and "rats," whereupon Hyman gave him a mild reprimand. On Wednesday, October 31, Rodeghiero did not report for work, allegedly because of "intestinal flu"; instead he went to the County Clerk's office to transact some real estate business of his own. There he met and greeted Berg, a son-in-law of Samuel Benatovich and an assistant district attorney, whom he had seen at the representation hearing. Not recognizing Rodeghiero, Berg asked another attorney who he was; the latter described him as "a well known criminal" who "either murdered or shot someone" and also as a numbers or policy man. Searching the files Berg found that Rodeghiero had been convicted of second degree assault in 1946 and for possessing policy slips in 1952 or 1953; in addition he came upon a psychiatric report indicating that Rodeghiero had "a very vindictive character." He communicated all this to his father-in-law, to whom he also gave a "mug shot" of Rodeghiero. Samuel and Hyman then called their labor attorney in New York; he advised that, although he would not recommend a discharge because of Rodeghiero's absence from work when well enough to attend to his own

affairs, the Benatoviches were under a legal duty to their help and to the public to discharge him because of his convictions and the psychiatric report. These talks coincided with issuance of the Board's decision and order (November 1) dealing with the 1961 disturbances. When Rodeghiero returned to work on Monday, November 5, he was called into Samuel's and Hyman's office. Samuel disclosed his knowledge of Rodeghiero's criminal record and, saying that he had to protect his employees, asked Rodeghiero to resign. Upon his refusal, Rodeghiero was discharged.

The trial examiner ruled that "despite the not inconsiderable suspicion which follows reasonably from above-noted facts," he was "unable to conclude that General Counsel has sustained his burden of proving that, in fact, the employee was discharged unlawfully in order to discourage union activities or because he was a witness at a Board hearing." A majority of the panel of the Board disagreed.

 The rule of law applicable in a case like this requires a delicate factual determination. "If employees are discharged partly because of their participation in a campaign to establish a union and partly because of some neglect or delinquency, there is nonetheless a violation of the National Labor Relations Act * * *." N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725, 726 (2 Cir. 1954); N. L. R. B. v. Great Eastern Color Lithographic Corp., 309 F.2d 352, 355 (2 Cir. 1962), cert. denied, 373 U.S. 950, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963). On the other hand, if an employee is discharged for neglect or delinquency, there is no violation simply because he was engaged in organizing and the employer sheds no tears at his loss. N. L. R. B. v. Birmingham Publishing Co., 262 F.2d 2, 9 (5 Cir. 1958); Ore-Ida Potato Prods., Inc. v. N. L. R. B., 284 F.2d 542, 545–546 (9 Cir. 1960); Local 357, Int'l Bhd. of Teamsters v. N. L. R. B., 365 U.S. 667, 679–680, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) (concurring opinion of Mr. Justice Harlan). Reconciliation of these two principles has its difficulties, especially in cases where the discharge was placed on a permissible ground and the employee's conduct, while a sufficient ground for discharge, was not so egregious as to demand it. The General Counsel can win by proving that other employees who committed similar acts but were not known to be engaged in union activity were not discharged, and he will normally lose if the employer can establish a record of discharges for similar conduct. See Tompkins Motor Lines, Inc. v. N. L. R. B., 337 F.2d 325, 330 (6 Cir. 1964). In the many cases where no such proof is tendered, the General Counsel must at least provide a reasonable basis for inferring that the permissible ground alone would not have led to the discharge, so that it was partially motivated by an impermissible one.

Although a man's motive, like his intent, is "as much a fact as the state of his digestion," Edgington v. Fitzmaurice, [1885] 29 Ch.D. 459, 483, Lord Justice Bowen's witty simile would become a pernicious over-simplification if it were permitted to obscure the differences in the mode of ascertainment and in the reliability of the conclusion. Evidence of such a "fact" may consist both of direct testimony by the one whose motive is in question and of inferences of probability drawn from the totality of other facts. While only the trial examiner can fully evaluate credibility, the Board is fully as capable of weighing the other inferences, and the statute "is wholly inconsistent with the notion that it [the Board] has power to reverse an examiner's findings only when they are 'clearly erroneous,'" Universal Camera Corp. v. N. L. R. B., supra, 340 U.S. at 492, 71 S.Ct. at 467, see also F. C. C. v. Allentown Broadcasting Corp., 349 U.S. 358, 364–365, 75 S.Ct. 855, 99 L.Ed. 1147 (1955).

 However, of the four "facts and circumstances" relied upon by the Board to show an anti-union motive in the discharge, 146 N.L.R.B. No. 32, at 5, all but the second reason, the Benatoviches' knowledge of Rodeghiero's union activity, are somewhat unsatisfactory;

and the second alone is not enough. We have already indicated why the first circumstance—the history of improper anti-union activity—must be qualified by the later improvement. The Board's third point rests in part on an official warning to Rodeghiero not to engage in "union talks" but in fact the trial examiner did not decide whether the Benatoviches used these words or a far more innocuous command to stop "disturb-[ing] the other people" in view of their complaints. For its fourth point, the Board said that Rodeghiero's ability as a butcher had not been questioned; but Hyman Benatovich testified that Rodeghiero was "the worst" butcher and "not a good worker." In contrast, the trial examiner had the only real opportunity to gauge the sincerity of the Benatovich brothers and to form a first-hand impression of Rodeghiero's character; the Regional Director, the only other official having independent contact with the parties, also felt that the charge could not be demonstrated. The examiner properly gave weight to the earlier failure of the respondents to discharge Rodeghiero on the complaint of other employees, and there is little reason to think they would have retained a butcher who had not engaged in union activity but had been convicted after trial, even many years back, under an indictment alleging that he had hired two persons to shoot a third. Nor were Rodeghiero's past disputes with other employees and his attention to personal business while purportedly out sick likely to endear him to his employers, whether or not he actually was their "worst" butcher. In short, the Board had nothing like the basis for reversing its examiner which I considered sufficient in Bon-R Reproductions, Inc. v. N. L. R. B., 309 F.2d 898, 905–910 (2 Cir. 1962), but a majority of this court did not. See also N. L. R. B. v. Hribar Trucking, Inc., 337 F.2d 414 (7 Cir. 1964); J. S. Dillon & Sons Stores Co. v. N. L. R. B., 338 F.2d 395 (10 Cir. 1964).

The few instances of alleged surveillance and improper interrogation recited in the decision are mostly trivial on their face. The Board's conclusions in several instances rest on disputed testimony not passed upon by the trial examiner. One incident is a supervisor's alleged offer of a benefits increase; but the only evidence that the remark had been made came from a single employee whose testimony the trial examiner accepted in part, rejected in part, and as to this remark failed to mention or evaluate. Similarly, the translation of Hyman's mid-September comment to Rodeghiero into a "broad no-solicitation rule" would require us to accept Rodeghiero's version rather than Hyman's, and then to take the language in its most literal sense although it might have been directed only to soliciting during working hours. See N. L. R. B. v. United Steelworkers, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958). The residue of the evidence—several management comments or queries concerning union support—generally falls short of the standards of unlawful interrogation and persuasion recently stated in N. L. R. B. v. Firedoor Corp. of America, 291 F.2d 328, 331 (2 Cir.), cert. denied 368 U.S. 921, 82 S.Ct. 242, 7 L.Ed.2d 136 (1961); Bourne v. N. L. R. B., 332 F.2d 47, 48 (2 Cir. 1964); and Federation of Union Representatives v. N. L. R. B., 339 F.2d 126 (2 Cir. 1964); certainly there was no instance of reprisal save the claim as to Rodeghiero which we have rejected. Considering the record as a whole, including the trial examiner's conclusions, see Universal Camera, supra, 340 U.S. 493, 71 S.Ct. 456, and being mindful that the standard for review is a shade more liberal than that for examining a jury verdict, although less liberal than that for examining the findings of a judge, 340 U.S. at 477–491, 71 S.Ct. 456, we hold that the Board's conclusion on this score is not supported by "substantial evidence," § 10(e), 29 U.S.C. § 160(e).

Enforcement denied.