MAGNALEASING, INC., Plaintiff,

v.

STATEN ISLAND MALL et
al., Defendants.

No. 74 Civ. 5593–LFM.

United States District Court,
S. D. New York.

March 22, 1977.

1040

Keane & Butler, New York City, for
plaintiff; by Thomas A. Butler, New York
City.

Marshall, Bratter, Greene, Allison &
Tucker, New York City, for defendants; by
Jeffrey Newman, New York City.

## MEMORANDUM

MacMAHON, District Judge.

This action seeks damages and rescission
of a lease agreement between plaintiff and
defendant Staten Island Mall ("Mall").
Plaintiff alleges that it was induced to sign
the lease by the fraudulent misrepresenta-
tions of defendants' agent, Feist & Feist.

The case was tried to the court on March 22, 23 and 24, 1976.

Magnaleasing, a wholly-owned subsidiary of the Magnavox Company, is engaged in leasing real estate for its parent and its parent's independent retailers. Defendant Mall is a joint venture between defendants Blackfriars Realty Corp. and Tottenham Realty Corp. Feist & Feist was the developer of the Mall and now acts as its managing and leasing agent.

Magnaleasing negotiated with Feist & Feist during the fall of 1972 for the leasing of a store in the Mall and eventually signed a fifteen-year lease on April 26, 1973. Plaintiff claims that during the negotiations and to induce plaintiff to enter into the lease, Feist & Feist made material misrepresentations regarding the amount of space already leased to others and false estimates as to what the common area charges and tax rent would be. Defendants assert that the representations were true, and that, regardless of their veracity, plaintiff was not justified in relying on them. Defendants further contend that, even if plaintiff establishes fraud, relief is barred by laches.

Negotiations over space in the Mall were conducted by George Kirtland of Feist & Feist and John Kelly of Magnaleasing. John Kelly received two Mall brochures from Kirtland in November 1972 which represented that 50% of the space had already been leased.[1] Kirtland met with John Kelly; Dale Kelly, a Magnavox zone manager; and Darryl Laxon, a Magnavox regional sales manager, on December 4, 1972. Both John and Dale Kelly testified that Kirtland said the Mall was practically all leased, with only one or two spaces left of the size needed for Magnavox store. Dale Kelly testified that Kirtland told him the Mall was 90% leased. Two floor plans representing the first and second levels of the Mall were then discussed. Leased locations were designated by a black dot or the names of future tenants. Over 60% of the available space was so designated. Kirtland also explained that more stores had signed leases since the plans had been printed. Those names were supplied by Kirtland, and John Kelly wrote them in the appropriate spaces.

There is no doubt that the representations regarding occupancy levels were representations of material facts made to induce plaintiff to rent space. The number of other stores in the Mall is important because it affects the amount of customer traffic and the amount of common costs each tenant will have to bear. Moreover, the volume and pace of demand for space evidence the general enthusiasm of other merchants, and the level of acceptance bears on the Mall's eventual success. The representations were made in the context of a sales pitch by the leasing agents. It is clear that Feist & Feist knew that the rate of leasing was an important factor in a tenant's decision of whether or not to rent space in the Mall, and Feist & Feist made those representations hoping Magnavox would rely on them. Dale Kelly testified that without those representations he would not have recommended that the lease be signed.

Feist & Feist's statements as to occupancy levels were false at the time they were made. A leasing report, prepared by Feist & Feist, dated September 14, 1972, shows that only 19% of the space was leased, but an August brochure states that 50% of the space was already rented.

Plaintiff also introduced a schedule listing all the leases signed by the Mall, the date on which they were signed, and computing the percentage of rented space every month. When Feist & Feist was representing, at the beginning of November, that the Mall was over 50% leased, the fact was that it was less than 32%. When Kirtland told the representatives of Magnavox, on December 4, that the Mall was almost all rented and that commitments from tenants

---

1. "More than 50 per cent of the space at Staten Island Mall has been leased by local and national chains." Staten Island Mall, August 1972.

"Feist & Feist, developers of the Mall with associated investors, said that leasing has surpassed the 50 per cent mark." Staten Island Mall, November 1972.

exceeded the 60% shown on a floor plan of the shopping area, the Mall was still only 32% leased.

Finally, Feist & Feist, as defendants' agent responsible for leasing and managing the shopping area, was aware of the actual rate at which the Mall was being leased. John Feist, vice-president of the company and in charge of the Mall's development, testified that every three weeks a leasing committee met and that a leasing report was prepared and circulated.

Defendants assert that their figures were accurate because they included leases which had been agreed upon but had not yet been signed. The September 1972 leasing report indicated that an additional 44.68% of the available space in the Mall was thus "tied up." Defendants contend that consummation of these agreements was a mere formality and, therefore, their representation that the Mall was 50% leased was not false.

The contention that eventual signature on these agreements was merely ceremonial is belied by the fact that it was not until over one year later that leases totalling the additional 44.68% were actually signed, and, in any event, the statements made were inaccurate whatever the state of negotiations.

Defendants next argue that, even if some of the representations were false, plaintiff was not justified in relying on them because only 24.2% of the space on the floor plan of the shopping center is marked by black dots designating space already leased. The contention ignores the testimony of both Kellys that Kirtland told them that spaces fitted with the printed name of a merchant (but perhaps without a black dot) were also rented, and that in order to make the plan current John Kelly should write in the names of tenants who had signed since the plan was prepared. In light of this

uncontradicted testimony, defendants' claim is totally without merit.

■ We find that defendants, through their agent, knowingly made material false representations regarding the volume and rate of leasing in order to induce plaintiff to rent space in the Mall.

Plaintiff also alleges that Feist & Feist made false statements regarding its estimates of the additional rent which tenants would be charged. Each tenant was to pay taxes and common area charges in addition to the fixed rent.

At the December 4 meeting, Kirtland said that the taxes were estimated at $1.25 per sq. ft., with the landlord paying the first $.25, and that thereafter taxes would be subject to normal increases. The common area charges, according to Kirtland, were estimated at $.60 per sq. ft. for the initial year and thereafter would be subject to normal increases due to inflation.

Plaintiff asserts that defendants' real estimates were far greater than the figures given.[2] Defendants assert that the figures given by Kirtland to the Magnavox employees were true estimates and contend that, in any case, mere expressions of estimates are opinions which cannot form the basis of an action for fraud.

■ It has long been the law of New York that an expression of opinion may constitute actionable fraud.[3] A statement of a man's opinion, estimate or prediction is a representation of his state of mind and, like his intent, is "as much a fact as the state of his digestion."[4] Mere predictions, however, may not form the basis for an action for fraud when both parties have equal access to the facts, or when it is obvious that the declarant is using a subjective standard. In these situations, reliance on the opinions is deemed unreasonable.

---

2. Presently, plaintiff is charged $6.04 per sq. ft. for taxes and $2.59 per sq. ft. for common area charges.

3. *Taylor v. Burr Printing Co.*, 26 F.2d 331, 334 (2d Cir. 1928); *Gray v. Richmond Bicycle Co.*, 167 N.Y. 348, 60 N.E. 663 (1901); *Hickey v. Morrell*, 102 N.Y. 454, 7 N.E. 321 (1886); W.

Prosser, Law of Torts § 109 (3d ed. 1964); 12 S. Williston, Contracts § 1494 (3d ed. 1970); 24 N.Y. Jurisprudence §§ 35–39.

4. *NLRB v. Park Edge Sheridan Meats, Inc.*, 341 F.2d 725, 729 (2d Cir. 1965); *Edgington v. Fitzmaurice* [1885], 29 Ch.D 459, 483.

However, where one party does have superior knowledge, the expression of an opinion implies that the declarant knows facts which support that opinion and that he knows nothing which contradicts the statement.

Only defendants were in a position to know the estimated costs of the completed Mall, the information necessary to form an opinion regarding the taxes and common area charges. Since the Mall was not completed at the time of the negotiations, Magnaleasing had to rely on what it was told by the developers of the shopping area. It was therefore reasonable for plaintiff to rely on defendants' representations, and if defendants gave plaintiff an estimate which defendants, in fact, did not entertain, in order to induce plaintiff to sign a lease, their estimates were fraudulent. The expression of an opinion or prediction which the declarant does not himself believe is a false statement of fact.

Although plaintiff was told in December 1972 that taxes were going to be $1.25 per sq. ft., those persons at Feist & Feist in charge of the financial data regarding the construction and operating expenses of the Mall were circulating estimates well in excess of that amount.

In August 1972, Don Faughnan, the comptroller of Feist & Feist, issued two memoranda estimating the tax at $2.15 per sq. ft. Faughnan testified that he also discussed that figure with John Feist. Ed Fraher, in charge of the financial data relating to construction, estimated the tax at $2.53 per sq. ft. John Feist sent Irving Feist, president of the company, a confidential memorandum in December 1972 admitting that Ed Fraher had told him that the taxes would be $2.34 per sq. ft. and warning that they would have problems with their tenants if taxes were that much. A Feist & Feist memorandum in January indicated that the initial taxes would be $2.42 and that they would be $4.55 per sq. ft. for the second year.

Surrounded by these estimates of over $2.00, John Feist, nevertheless, instructed his salesmen to tell potential tenants that the Feist & Feist estimate was $1.25. He testified that he did not believe his financial experts and relied instead on his own estimate which he based on a 1970 tax of $.80 per sq. ft. imposed on a nearby Korvette's shopping center. Feist testified that he adhered to this estimate, although the Korvette's center was not a covered mall, as was defendant Mall, and although the Korvette's parcel, completely developed, was assessed at $6.8 million, while the land alone for defendant Mall was valued at nearly $6 million.

We find John Feist's story, that he relied on the tax of a dissimilar shopping area while rejecting the opinions of the Feist & Feist financial experts, totally incredible. Moreover, John Feist was evasive and unresponsive on the witness stand. He denied any memory of receiving memoranda addressed to him, even those bearing his own notations.

Clearly, the tax charged to a tenant per square foot is a material fact. We find that Feist & Feist, defendants' renting agent, deliberately misrepresented its tax estimate in order to induce plaintiff to lease space in the Mall.

The record regarding common area charges is similar. Although Kirtland represented on December 4 that Feist & Feist estimated common area charges at $.60 per sq. ft., in August 1972 Faughnan had sent two memoranda to John and Irving Feist. The first estimated such charges at $1.76, and the second at $2.26 per sq. ft. Fraher estimated the charges at $2.26 in October, and a January memorandum of Feist & Feist estimated them at $2.04.

Again, surrounded by estimates of over $2.00, John Feist substituted the more saleable figure of $.60. His only explanation for the disparity between his estimate of the charges and the resulting actual charge of $2.59 per sq. ft. to tenants was the unpredictable effect of the Arab oil embargo on snow removal. This is even less convincing than his explanation for misrepresenting estimated taxes.

We find that Feist & Feist deliberately misrepresented $.60 as its estimate of the

per square foot common area charge when, in fact, it actually believed that the charge would be substantially greater.

We turn now to the defense of laches. Defendants contend that, even if plaintiff has been able to establish fraud, its delay in bringing this action while remaining in possession of the property should bar recovery.

■ An action for fraud does not accrue until discovery of the fraud. Plaintiff first learned that the additional rent charges for taxes would exceed the Feist & Feist estimate in August 1973 when taxes were billed at $2.45 per sq. ft. Plaintiff was never told of the Feist & Feist estimate of $4.55 for the second year taxes. Instead, plaintiff was told, in April 1974, that the second year tax estimate was $2.64. Plaintiff was backbilled in 1975 at the rate of $5.80.

Plaintiff first learned about the misrepresentations regarding common area charges in April 1974. At that time, it was backbilled to February 1, 1974, at a rate of $2.58 per sq. ft. Only in December 1974 were common area charges backbilled for the period between August 9, 1973 through January 31, 1974, at the rate of $2.58 per sq. ft.

Plaintiff promptly protested each time it learned of the difference between what was represented and what it was actually charged for taxes and common area charges. Letters were exchanged in the fall of 1973 over the amount of tax rent that was being charged. John Kelly wrote John Feist, in April 1974, setting forth the misrepresentations regarding tax rent, common area charges and occupancy levels. A meeting and further correspondence occurred in May and June 1974. That summer, plaintiff, along with other tenants, hired an attorney to negotiate with the landlord. Plaintiff stopped paying additional rent charges over the represented estimates in August 1974. Defendants then sued in the fall of 1974 for rent arrears. This action was filed December 19, 1974.

■ The facts cannot support any claim by defendants that there was undue delay in bringing this action. After every discrepancy became known, defendants were made aware of plaintiff's objections and attempts were made to settle the dispute by negotiations.

This action was filed in December 1974, although the extent of defendants' misrepresentations were still not completely known. There is no evidence of undue delay. We, therefore, do not consider whether defendants have been prejudiced. Finally, plaintiff was not required to leave the premises before bringing this action.[5] Recovery is not, therefore, barred by waiver or laches.

■ Accordingly, we find that plaintiff was induced to enter into the lease for space in the Mall by material false and fraudulent representations by defendants' agent. The lease is, therefore, rescinded.

It appears that the issue of the amount of damages due to plaintiff is complex and will involve matters of accounting. Accordingly, this action is referred to Magistrate Martin D. Jacobs, as Special Master, to take an accounting and to hear, compute, determine and report as to the amount of damages due to plaintiff.

The foregoing memorandum constitutes this court's findings of fact and conclusions of law, in accordance with Rule 52, Fed.R. Civ.P.

Settle judgment within twenty (20) days not inconsistent with the foregoing memorandum.

### ON MOTION TO CONFIRM MASTER'S REPORT

Plaintiff moves, by order to show cause, to confirm the report of Magistrate Martin D. Jacobs, pursuant to Rule 53(e)(2), Fed.R. Civ.P.

In our decision dated June 30, 1976, we granted plaintiff rescission of its lease with defendant, Staten Island Mall, finding that defendants had made material misrepresentations with respect to occupancy levels, amount of tax rent, and amount of common

---

**5.** N.Y. Civil Practice Law & Rules § 3004 (McKinney 1974).

area charges. We also referred the action to Magistrate Jacobs, as Special Master, "to take an accounting and to hear, compute, determine and report as to the amount of damages due to plaintiff," because it appeared that the damage issue was complex and would involve time-consuming mathematical computations or matters of accounting best delegated to a Magistrate.

Opposing the motion, defendants contend that by our reference we improperly reopened the case, thus giving plaintiff "two bites of the apple" in proving damages. We disagree.

■ The trial record contained sufficient evidence for a computation of damages by the Special Master but, in our view, required clarification and focusing into a meaningful pattern of proof. The case was not reopened to hear new evidence on the damage issue. In any event, the trial judge, in his sound discretion, may reopen a case and sua sponte refer it to a Special Master to hear further evidence.[1]

■ Defendants have failed to make any showing of prejudice or surprise by any additional evidence, and any such evidence was received merely to clarify that already offered at trial. Therefore, even if the case were deemed to have been reopened, we find that the reopening was in the interests of fairness and substantial justice.

■ Defendants contend that the reference was improper because the case does not involve the determination of issues for which a reference is appropriate. However, that objection is untimely and not made in the proper forum because defend-

ants did not raise it until their appearance before the Magistrate for the hearing on damages. An objection to reference should be made before the trial judge at or prior to the time of reference.[2] Furthermore, defendants waived that objection by consenting to the judgment of reference. Finally, this non-jury action obviously falls within the category of cases appropriate for reference to a Magistrate because it involves matters of accounting and complex damage computations.[3] Therefore, we find the reference was proper in all respects.

■ Defendants also contend that plaintiff Magnaleasing is not entitled to any damages because any damages involved in this case were incurred by Magnavox, its parent company, rather than by plaintiff. However, plaintiff operated as a separate corporate and financial entity. Although the payments for improvements, rent, and taxes were made directly by Magnavox on behalf of plaintiff, plaintiff incurred a liability to Magnovox for those expenditures and has in fact been repaying Magnavox. Therefore, plaintiff is entitled to damages.[4]

■ Defendants further contend that plaintiff is not entitled to damages representing the difference between the common area charges and tax rent paid and that which defendants represented would be due because it is a claim for lost profits, a forbidden measure of damages under New York law. Such a contention is totally lacking in merit. It is clear that the measure of damages in an action for fraud is the pecuniary loss suffered by the defrauded party as a direct result of the false representations.[5] Plaintiff seeks, in effect, restitution

---

1. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331–32, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *First Iowa Hydro Elec. Corp. v. Iowa-Illinois Gas & Elec. Co.*, 245 F.2d 613, 627 (8th Cir. 1957); *Smith v. Brown*, 3 F.2d 926, 927 (5th Cir. 1925); *Reconstruction Finance Corp. v. Commercial Union of America Corp.*, 123 F.Supp. 748, 750 (S.D.N.Y.1954); 6A J. Moore, Federal Practice ¶ 59.04[13] (2d ed. 1974).

2. See *Cruz v. Hauck*, 515 F.2d 322, 331 (5th Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976).

3. See 28 U.S.C. § 636(b)(2); Rule 53(b), Fed.R. Civ.P.; Jurisdictional Checklist, Judicial Conference Committee on the Administration of the Federal Magistrates System, II(C)(1)(5).

4. *Silinsky v. State-Wide Ins. Co.*, 30 A.D.2d 1, 289 N.Y.S.2d 541, 546 (2d dep't 1968); see *Kinsfather v. Grueneberg*, 47 A.D.2d 789, 365 N.Y.S.2d 903, 907–08 (3d dep't 1975).

5. See *Martina Theatre Corp. v. Schine Chain Theatres, Inc.*, 278 F.2d 798, 802 (2d Cir. 1960).

of the excess money it actually paid to defendants for common area charges and tax rent, and those payments are a pecuniary loss directly caused by defendants' fraudulent misrepresentations.

■ Defendants also claim that plaintiff failed to mitigate damages. Defendants, however, have failed to carry their burden of showing how plaintiff acted unreasonably or what damages it could have mitigated. In addition, the Magistrate found that the improvements were particularly adapted for use in the store and would have no salvage value if removed. We cannot say that conclusion is clearly erroneous. We, therefore, reject defendants' contention that plaintiff failed to mitigate damages.

■ Defendants further contend that it is improper to assess damages attributable to tax rent and common area charges on the basis of "leased" space, as provided in plaintiff's lease with the Mall, because plaintiff could have secured lower rates based on "leasable" space. Thus, defendants argue, the damages representing the difference between those rates is attributable to plaintiff's inept negotiating rather than to defendants' misconduct. Defendants cite absolutely no authority for this proposition, and we think it is patently wrong.

Plaintiff suffered damages because it made payments on the basis of leased space, and those damages resulted from defendants' misrepresentations which induced plaintiff to sign the lease. Plaintiff is entitled to damages based upon the lease which it actually signed and the monies it expended as a result, not upon some hypothetical lease or expenditures. Furthermore, there would have been little difference between damages based upon leased space and those based on leasable space had the actual occupancy level been as defendants represented. Finally, 101 of the 114 leases at the Mall were entered into on a leased space basis, and, therefore, plaintiff's lease was neither

unusual, nor it appears, the result of inferior bargaining.

An appropriate sum for inflationary costs which plaintiff would have incurred in any event must be subtracted from plaintiff's claim for overpayment of common area charges to arrive at the proper amount of damages. Defendants, however, challenge the 15.5% inflationary rate the Magistrate selected to compute that sum and argue that either a 48.7%, 42.2% or 24.9% rate is closer to the actual rate. Plaintiff had earlier championed a 10.0% rate. All of these rates are subject to challenge on one ground or another because the data from which they were computed is incomplete and does not permit accurate comparison between different years due to the method and manner of its compilation.

■ The Magistrate found that the most significant evidence concerning the inflationary rate was that common area charges assessed against plaintiff had not increased since it entered the Mall in August 1973. In addition, defendants did not introduce any evidence of increases in common area expenses since the shopping center was opened. Under all the circumstances, we cannot say that the Magistrate's conclusion that a 15.5% rate was appropriate is clearly erroneous.

Accordingly, plaintiff's motion to confirm the report of Magistrate Jacobs, dated February 14, 1977, is granted. Settle judgment within ten (10) days.