**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**HENLOPEN MANUFACTURING CO.,
INC., Respondent.**

**No. 163, Docket 78–4054.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 2, 1978.

Decided May 3, 1979.

Mary Schuette, Washington, D.C. (William R. Stewart, Deputy Asst. Gen. Counsel, L. Joseph Ferrara, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

John M. Capron, Atlanta, Ga. (Fisher & Phillips, and Samuel Tannenbaum, DiFalco, Field & Lomenzo, New York City, of counsel), for respondent.

Before MOORE, FEINBERG and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

The National Labor Relations Board (the "Board"), is petitioning for enforcement of its order, 235 N.L.R.B. No. 33 (1978), issued against Henlopen Manufacturing Co. (the "Company"), on March 17, 1978, pursuant to § 10(e) of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 160(e) (1976). The order affirmed the rulings, findings and conclusions of the Administrative Law Judge ("ALJ") except for a minor modification of the remedy. The ALJ's decision, in turn, was made after a trial upon a complaint, which according to the ALJ, alleged that the Company

"violated Section 8(a)(1) of the Act by soliciting grievances from its employees in order to discourage interest in the Charging Party unions which were seeking to organize its employees, by threatening employees with discharge, elimination of part-time work and institution of a more onerous production quota system if they supported the unions, and by promising and granting benefits, including a new work-incentive plan, in order to induce employees to refrain from supporting the unions."

The complaint also alleged that the Company "first transferred employee Cecilia Caruona to a more onerous job and then discharged her because of her union activities in violation of Section 8(a)(3) and (1) of the Act". 29 U.S.C. § 158(a)(3) and (1) (1976). The general purport of the complaint is that the Company by various actions and threats showed such an anti-union animus as to constitute a violation of Section 8.

The Company is a New York corporation located principally in Melville, New York. It manufactures and sells plastic cases and brushes for cosmetics and related products and has some 200 employees. There are two main production areas in the Company's plant: the molding department, where plastic parts are formed in injection molding machines, and the assembly department, where the plastic parts are put together. During the relevant time period, both the International Industrial Production Employees Union ("IPEU") and Local 917, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("Teamsters") were engaged in organizational campaigns at the Company's Melville plant.

I

In order to establish a context for the issue which is before the court, the various charges which the ALJ dismissed are relevant. These events occurred during organizational campaigns of the IPEU and the Teamsters.

The alleged threat of elimination of the Company's part-time shift was based upon a Company leaflet or letter circulated on October 11, 1976. As to this letter the ALJ found that the General Counsel had not proven "that the letter threatened reprisals".

Another incident in September involved an employee Fawn Russo, a "paid union organizer trainee" through whom the General Counsel advanced the charge that the Company "solicited grievances, implied that they would be implemented, or actually implemented them in order to discourage union activity". The ALJ found that the General Counsel had failed to substantiate this charge. Likewise the ALJ found that "the General Counsel has failed to sustain his burden of proving that Respondent [the Company] promised an improved bonus system or threatened more onerous production quotas in violation of the Act".

Hence, the ALJ dismissed all the charges of unfair labor practices except one. The one unfair labor practice he found, on which the order is sought to be enforced, is the charge that the Company unlawfully discharged the employee Caruona.

## II

In August, 1976, Cecilia Caruona applied for work at the Company and was interviewed by Manuel Garcia, the assembly department manager, on Friday, August 13. She was hired to work in the assembly department. She began work on Monday, August 16; her work hours, 8:30 a. m. to 1:00 p. m., were based on her request to work part-time.

Prior to Caruona's application for employment, she had agreed to become a "student" IPEU organizer; of this the Company was not aware. The IPEU promised to pay Caruona $50 per week while she was organizing. Her instructions as an organizer were to do her work, try to organize her employer's workers, and report back to the IPEU any information relevant to any organizing efforts. The essentials of these instructions were repeated when she informed the IPEU that the Company had hired her. During the less than two weeks she worked for the Company, Caruona received $50 a week from the IPEU.

Caruona worked four days on the day shift in the assembly department. On Monday, August 16, her production was 50 percent of standard; it improved to 77 percent of standard on Thursday. The average productivity of new workers at that time was 58 percent of standard. On Thursday she was seven minutes late for work because she had been in an automobile accident. She apparently was two minutes late on Tuesday.

Caruona commenced her attempts to organize the Company's employees during her first week of work. On Tuesday, August 17, she obtained a signed authorization card from Fawn Russo. Before and after work and during lunch breaks, she talked to employees about supporting the IPEU and handed out leaflets and cards.

On Thursday, the 19th, Garcia asked Caruona if she would transfer to the molding department on an evening shift. The job in the molding department paid 70 cents more per hour than her job as an assembler. The ALJ found that "she willingly and voluntarily accepted Garcia's offer for a transfer to the molding department". Caruona began work in the molding department on Friday, August 20, at 8:30 p. m. She was assigned to learn to perform quality control work and to work on one of the molding machines. That Friday night Caruona worked only two hours. The reason, according to the Board's brief (p. 6), was as follows:

"Due to a digestive problem caused by tuna fish she had eaten during a break, the 'constantly ringing' machine noise, and plastic odors she found 'repulsive', Caruona became sick that night and did not work the next working night, Monday, August 23."

Caruona was outside the plant on Tuesday, August 24, during the day shift, passing out IPEU cards and pamphlets. Maxwell Mutter, the Company's Vice-President and Comptroller, saw her distributing the union literature and attempted to chase her off the property. When Caruona told him that she was an employee and refused to leave, Mutter simply left.

Caruona worked the night of August 24, wearing a shirt with "IPEU" and "vote union" lettering on it. The same night

Caruona received minor burns to her hands from operating the molding machine and immediately obtained first aid. Also during that shift she had to weigh and stack heavy boxes. She did not report for work on Wednesday night, the 25th.

On August 25, Vice-President Mutter read a speech to the Company's employees in which he asserted that a union was unnecessary and that the Company did not want a union and would oppose it in every legal way.

Caruona sought out Mutter at the plant on August 26 and told him that she could not work that night because she was sick and that she wanted her former assembly job back. Mutter told her that he could not transfer her back to assembly because the Company did not make transfers at the "whim of employees"; that she had not really given her new job a chance; and that she should try to do better at her work. She replied that she was going to see a doctor to see if she was too sick to work.

Caruona saw Mutter again the next day, Friday, August 27, and told him she was too sick to work. Mutter asked her if she was resigning; Caruona said no. Then Mutter fired her.

The Administrative Law Judge found that the transfer of Caruona to the molding department was not effected for unlawfully discriminatory reasons. He also pointed out that no one contended that Mutter's speech was illegal. He found only two acts which violated the NLRA, namely, Mutter's refusal to transfer Caruona to the assembly department day shift and the subsequent dismissal. He found that but for Caruona's union activity, she would have been permitted to return to the day shift in lieu of being discharged.

The timing of the events is of considerable importance in passing upon whether anti-union animus was shown by the employee Caruona incident. All the events above described, relied upon by the General Counsel to show animus, occurred in September and October 1976. Caruona's brief period of part-time work was in a period between August 16 and August 27, 1976.

Upon this single short-lived incident the ALJ based his conclusion that the Company's "conduct both in refusing to transfer Caruona back to the day shift and in thereafter discharging her was unlawfully motivated" and resulted in a violation of Section 8(a)(3) and (1).

### III

Thus, the issue is whether there is substantial evidence on the whole record to support the Board's finding that the Company discriminatorily refused to transfer Cecilia Caruona to the day shift on account of her union activities and fired her because she refused to work on the night shift.

■ The most striking aspect of this case is the Board's failure to produce evidence that the Company tried to discourage membership in a union by *discrimination* in a term or condition of employment, as is required by § 8(a)(3). The Board could have proved discrimination, in the sense of treating equals differently, if it had introduced evidence that employees who were not engaged in union activity were granted their requests to be transferred to a different department. *Cf. N.L.R.B. v. Park Edge Sheridan Meats, Inc.*, 341 F.2d 725, 728 (2d Cir. 1965) (enforcement denied; not substantial evidence of anti-union motive). This the Board apparently was unable to do. The Board relies on what it calls the Company's "flexible transfer policies" to prove that Caruona was subjected to discriminatory treatment. What these "flexible transfer policies" amounted to was a policy of temporarily shifting employees from the assembly department to the molding department and back again according to the Company's changing needs. This court finds no evidence that any employee, whether or not a union adherent, was ever granted a request, merely upon his or her own desire, to move from one department to another. The Company made transfers according to its operating needs, not according to the likes or dislikes of employees. Here, the Company reasonably asked that Caruona perform the work in her assigned

department. Caruona had worked less than ten hours total in molding and simply refused to go back at all for any length of time. To paraphrase Judge Friendly, if an employee is discharged for refusing to perform legally assigned tasks, there is no violation simply because she was engaged in organizing and the employer sheds no tears at her loss. *N.L.R.B. v. Park Edge Sheridan Meats, Inc.,* 341 F.2d 725, 728 (2d Cir. 1965). The Board has attempted to create an inferential mountain out of a factual molehill.[1]

■ The Board emphasizes the "suspect" timing of Caruona's discharge. Mutter's decision closely coincided with his learning of Caruona's union activities and with the beginning of the union's organizing campaign. We recognize that the temporal coincidence of an action adverse to a union activist and the beginning of an organizational drive, combined with the Company's knowledge of the employee's union activities, can support an inference of antiunion motivation. *N.L.R.B. v. Dorn's Transportation Co., Inc.,* 405 F.2d 706 (2d Cir. 1969). However, in this case the evidence is clear beyond peradventure that Caruona herself baited the Company into firing her. Thus she unequivocally testified "I most emphatically said I would not quit and I told him I would not resign . . . he would have to terminate me. . . ." Even then she said that Mutter told her "he didn't want to terminate [her] me". Caruona then gave her ultimatum "Give me my old job back" and "as a result, he fired me".

1. Not without significance are cases almost contemporary with this case wherein the General Counsel charged that Henlopen had taken adverse action against employees because of alleged union activities. The events on which the charges were based occurred several months after the discharge of Caruona but still during the organization campaign of the IPEU. (Cases 29–CA–5842, 29–CA–5898, 29–CA–5898–2). The NLRB adopted the ALJ's findings and conclusions in an order dated December 11, 1978. The ALJ found that Henlopen violated § 8(a)(1) by interrogating one employee about her union activities. In the course of dismissing the other charges, the ALJ found that "the evidence is also conclusive that the Company must keep the molding machines running or else there is no work to be done by the assembly employees". With respect to two

■ One separate issue remains to be considered. The Company argues that "a paid union infiltrator" is not a *bona fide* employee under the Act. On these facts, and on the basis of the Board's decisions, we find that Caruona was an employee protected by the Act. *See Anthony Forest Products Co.,* 231 N.L.R.B. 976 (1977); *Oak Apparel, Inc.,* 218 N.L.R.B. 701 (1970); *Dee Knitting Mills, Inc.,* 214 N.L.R.B. 1041, enf'd without published opinion, No. 75–4016 (2d Cir. Oct. 21, 1975). *But see N.L.R.B. v. Elias Brothers Big Boy, Inc.,* 327 F.2d 421 (6th Cir. 1964).

In summary, the Board's finding that the Company's treatment of Caruona was motivated in part by her union activities was not supported by substantial evidence. The Company therefore did not violate § 8(a)(1) and (3) of the NLRA.

ENFORCEMENT DENIED.

FEINBERG, Circuit Judge (dissenting):

I cannot agree that there is insufficient evidence to support the Board's conclusion that the Company violated sections 8(a)(3) and (1) of the National Labor Relations Act (the Act) by discriminatorily refusing to transfer Cecilia Caruona and by discharging her because of her union activities. The facts in the record indicate otherwise.

Caruona originally began work for the Company on the day shift in the assembly

employees who had alleged that they had been discriminatorily transferred, the ALJ said, in part:

"[T]o assign a particular employee to molding . . . was not out of the ordinary. There is simply no basis on these facts to infer a discriminatory motive in the assignment of either of these employees to molding".

Pertinent to the Caruona case is the ALJ's comment that

"[T]he fact that Daiuto [who had been transferred to the molding department] was an active supporter for the Union . . . does not insulate her from performing all of the duties required of employees, nor does this fact require the company to make special dispensation for her".

department. Her subsequent assignment to the night shift in the molding department was initially on a voluntary basis. The Administrative Law Judge (ALJ) found that this transfer was a promotion for her (the pay was 70 cents per hour greater) and that she had been a satisfactory employee in the assembly department prior to the transfer. Caruona testified that the fumes and the noise in the new job "got me sick," and the ALJ obviously believed that her request to transfer out of that job was for medical reasons. The ALJ found that after the Company became aware of Caruona's union activities, it insisted that she remain in the molding department even though the employee she was supposed to assist there allegedly did not want to work with her and the Company charged that she could not handle the expensive molding equipment.

The majority bases its decision on the Board's failure to establish that the Company previously had treated non-union employees who requested transfers for medical reasons differently from Caruona. However, the Board may infer anti-union animus from a variety of types of evidence, and proof of different treatment of similarly situated employees is not absolutely necessary. See, e. g., *NLRB v. Advanced Business Forms Corp.*, 474 F.2d 457, 464–65 (2d Cir. 1973); *NLRB v. Dorn's Transportation Co.*, 405 F.2d 706, 712–13 (2d Cir. 1969). In the main case relied upon by the majority, *NLRB v. Park Edge Sheridan Meats, Inc.*, 341 F.2d 725 (2d Cir. 1965), the panel indicated that the employer's past treatment of similarly situated employees might be the most conclusive proof in a discriminatory discharge case. However, the court also went on to state:

> In the many cases where no such proof is tendered, the General Counsel must at least provide a reasonable basis for inferring that the permissible ground alone would not have led to the discharge, so

that it was partially motivated by an impermissible one.

*Id.* at 728.

This is one of the "many cases" where there was no evidence before the Board that the Company had previously faced a similar situation. Thus the ALJ and the Board could look to other evidence to determine how the Company would have treated a request for transfer, based upon medical reasons, from a non-union employee. There is evidence in the record that the Company had in the past shown concern over its employees' health and that it had been flexible in transferring employees between the two departments. Indeed, the Company had applied its generally flexible policies to Caruona before it discovered that she was a leading union member and organizer. Thus, the ALJ and the Board could properly have found that soon after the Company found out about Caruona's union activities, it departed from its usual flexible policies regarding transfer and concern for employee health, previously applied to Caruona, by refusing her request for transfer, based upon job-related illness—all this after promoting her out of the department to which she requested return. The ALJ and the Board thus concluded that the Company gave Caruona "a Hobson's choice—either continue in an onerous job or be fired—because of [the Company's] recently acquired knowledge of [Caruona's] union activities." On this record, and applying the doctrine that the Board's rulings on motivation "cannot lightly be overturned," *NLRB v. Advanced Business Forms Corp., supra,* 474 F.2d at 464, I conclude that the Board has met its burden of providing "a reasonable basis for inferring that . . . the discharge . . . was partially motivated by an impermissible [anti-union ground]," *NLRB v. Park Edge Sheridan Meats, Inc., supra,* 341 F.2d at 728.

Therefore, I dissent from the majority's holding that there was insufficient evidence of a violation of sections 8(a)(3) and (1) of the Act.[1]

---

1. I agree with the majority that on these facts Caruona was an employee protected by the Act.