968 F.2d 1327
 140 L.R.R.M. (BNA) 2745, 297 U.S.App.D.C.
45, 61 USLW 2093,
122 Lab.Cas. P 10,277
 WILLMAR ELECTRIC SERVICE, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Brotherhood of Electrical Workers, Local 46,
and Michael Hendrix, Intervenors.
 No. 91-1312.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 8, 1992.
Decided July 21, 1992.
 
 Maurice Baskin, for petitioner.
 John H. Fawley, Attorney, N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Peter Winkler, Supervisory Atty., were on the brief, for respondent.
 John Burns, for intervenors.
 Before: BUCKLEY, WILLIAMS and D.H. GINSBURG, Circuit judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 This petition raises the issue of whether the word "employee" in § 2(3) of the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. § 152(3) (1988), encompasses a job applicant who is employed by a union at the time of application, seeks the job for the purpose of organizing the work force, plans to retain some kind of employment affiliation with the union, and has at least a substantial prospect of later returning to full-time employment by the union. If the applicant, Mike Hendrix, was an "employee" as the Act uses the term, he was entitled to protection from anti-union discrimination and coercion, see, e.g., § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1988). If he was not, then petitioner Willmar Electric Service was free to reject his job application without satisfying the National Labor Relations Board's test--i.e., without showing that it would have rejected him without regard to those aspects of his relation to the union that the Act protects (e.g., membership, protected union activities). See Wright Line, 251 NLRB 1083 (1980) (in "mixed motive" case, to establish unfair labor practice general counsel must show that an anti-union motive animated the decision; employer can avoid liability by showing that it would have made the same decision in the absence of the anti-union motive), enf'd, NLRB v. Wright Line, 662 F.2d 899 (1st Cir.1981); see also NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving Wright Line ). The Board ruled that despite his employment relation with the union, Hendrix was an employee for purposes of § 2(3), so that Willmar's refusal to hire him on the ground of his union activities--which Willmar does not here seek to defend under the Wright Line rule--violated §§ 8(a)(1) & (3). Accordingly the Board found that Willmar had committed an unfair labor practice. We find the Board's reading of § 2(3) permissible and grant its application for enforcement.
 
 
 2
 * * *
 
 
 3
 Hendrix, a journeyman electrician by trade who had just begun working as a field organizer for the relevant local of the International Brotherhood of Electrical Workers, contacted Willmar in June 1988 about the possibility of using unionized labor for its electrical work at a nearby construction project. Over the next several months it became clear that Willmar did not want to deal with the union. In October Hendrix submitted an application on behalf of himself for a job as an electrician, in which he listed his present employer as the IBEW and his reason for leaving as to "work in the field", by which Hendrix meant (according to his later testimony) that he would "be going into the field to organize actually on the job." And so, while he would "probably" stop receiving money from the union and take a cut in pay, he would "retain the title of field organizer." Hendrix made clear to Willmar's project foreman, Douglas Rose, that he intended to use his free time during lunch and after work to try to organize Willmar's employees. As he waited for a response, Hendrix continued engaging in activities on behalf of the union, such as organizing a picket line at Willmar's job site to protest the wage level. In December Rose told Hendrix that, although he was still hiring, he was not giving consideration to Hendrix's application, because "it's kind of hard to hire you when you're out there on the other side, picketing."
 
 
 4
 In September of 1989 an administrative law judge held that Willmar had violated §§ 8(a)(1) and 8(a)(3) of the Act by failing to hire Hendrix and by engaging in other coercive or discriminatory acts (including the failure to hire a man named Allen Haugen because of his suspected union sympathies). The NLRB affirmed the ALJ's rulings. Since Willmar's petition for review challenges only the holding with respect to Hendrix, we address only this order and enforce the other orders without comment.
 
 
 5
 * * *The chief issue on appeal is whether employment ties to a union of the sort held by Hendrix bar a person from classification as an "employee" (of some entity other than the union) under § 2(3), and thus remove him altogether from the protections of §§ 8(a)(1) & (3). A few preliminary remarks are necessary to narrow this issue.
 
 
 6
 First, it makes no difference that Hendrix was not working for Willmar at the time of the alleged unfair labor practice. Applicants for employment are considered "employees" under the Act. See Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). So the refusal to hire Hendrix is legally indistinguishable from the firing of an employee of a company who reveals that he has just established similar ties to a union.
 
 
 7
 Second, despite Hendrix's employment ties to the union, there is no real claim that Hendrix's hoped-for job with Willmar would have been a sham. In most respects Hendrix would have been indistinguishable from a zealous volunteer who resolved to use his free time during lunch and after work to advance the union's interests. Obviously, however, his then-current job with the union (which was typical in the sense that applicants often held jobs that they would drop if accepted by Willmar) his retention of a vague union title, and his prospect of re-employment by the union might have had various subtle (or perhaps not so subtle) effects on his conduct as a Willmar worker. The nub of the controversy is whether Hendrix's employment ties to the union disqualified him from being a Willmar employee enjoying full protection of the Act.
 
 
 8
 Our analysis begins with Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the inquiry whether Congress clearly resolved the issue. Id. at 842-43, 104 S.Ct. at 2781-82. As moonlighting is widespread, it is plain that the word "employee" cannot exclude concurrent employment generally. Once that (obvious) step is taken, it is hard to see how one could exclude employment by a union as well as another employer except on grounds either of some implication from the structure of the Act or some powerful legislative history. But in fact closely related legislation, the Labor Management Relations Act, manifests a congressional assumption that an employee may be employed by a union and another entity. Although its § 302 generally prohibits payments from an employer to an employee of a union, it excepts from that ban payments made "to any ... employee of a labor organization, who is also an employee ... of such employer, as compensation for, or by reason of, his service as an employee of such employer". 29 U.S.C. § 186(c)(1) (1988).[1] Willmar points to nothing in the legislative history that would overcome this implication.
 
 
 9
 The Supreme Court recently stated a presumption that a statutory use of the term "employee" should be taken to have its common law meaning unless Congress "clearly indicates otherwise", Nationwide Mutual Insurance Co. v. Darden, --- U.S. ----, ----, 112 S.Ct. 1344, 1349, 117 L.Ed.2d 581 (1992), observing wistfully that after each of two prominent decisions in which the Court ventured beyond the common law guidelines, one of them a decision construing the NLRA (NLRB v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)), Congress had "amended the statute so construed to demonstrate that the usual common-law principles were the keys to meaning", --- U.S. at ----, 112 S.Ct. at 1349. As the Court noted, the NLRA "defined 'employee' to mean (in relevant part) 'any employee' ", --- U.S. at ---- n. 4, id. at 1349 n. 4, i.e., it failed to indicate rejection of the common law model.
 
 
 10
 Under common law principles "[a] person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other." Restatement (Second) of Agency § 226 (1958); Kelley v. Southern Pacific Co., 419 U.S. 318, 324, 95 S.Ct. 472, 476, 42 L.Ed.2d 498 (1974) (recognizing that under the common law a servant can have two masters in a variety of relations); Dellums v. Powell, 566 F.2d 216, 222 & n. 22 (D.C.Cir.1977) (same). Until such time as an employee "abandons" the non-union employer for the union employer, it is hard to see why he should be denied the protection of the Act.
 
 
 11
 Against this, Willmar presses the point that Hendrix's employment relation to the union would subject Willmar to intolerable risks of disloyalty. A similar concern played a large role in the Fourth Circuit's recent holding that a full-time union employee, who proposed to continue as such even if his application should be accepted by the proposed non-union employer, could not be an "employee" under § 2(3), H.B. Zachry Co. v. NLRB, 886 F.2d 70 (4th Cir.1989). The court said that the "term [employee] plainly does not contemplate someone working for two different employers at the same time and for the same working hours", id. at 73. (It was stipulated in Zachry that the individual would remain employed and supervised by the union "even during the precise hours he was to work for Zachry." Id.) See also NLRB v. Elias Brothers Big Boy, Inc., 327 F.2d 421 (6th Cir.1964) (similar reading of "employee"); but see NLRB v. Henlopen Manufacturing Co., Inc., 599 F.2d 26 (2d Cir.1979) (rejecting Elias without explanation).
 
 
 12
 This risk of disloyalty is surely not to be discounted. Indeed, we are ready to assume arguendo that Willmar made out so powerful a case of likely disloyalty that the Board would have had to conclude that rejection of Hendrix's application on that ground would have been legitimate and not in violation of the anti-discrimination and anti-coercion provisions of the Act. "Nothing in the Act prevents an employer from disciplining or discharging an employee for disloyalty". George A. Hormel & Co. v. NLRB, 962 F.2d 1061, 1064 (D.C.Cir.1992). An employer may dismiss an employee for arson (or propensity to arson), but if the arsonist is also a union member and proves that the employer fired him for organizing activity, the employer may not evade the Wright Line rule by saying that arsonists are not "employees"; it must prove that it would have fired the arsonist even if he hadn't been engaged in union-related activities.
 
 
 13
 Willmar invokes two further specters. First, it suggests that there might be anomalies in Hendrix's participation in a vote at Willmar on union representation. See also H.B. Zachry v. NLRB, 886 F.2d at 74-75. But Hendrix's qualification as an "employee" is not the same as eligibility to vote; he could be included in a bargaining unit only if found to share the necessary community of interest with other workers. See, e.g., NLRB v. Action Automotive, Inc., 469 U.S. 490, 105 S.Ct. 984, 83 L.Ed.2d 986 (1985) (employees related to owner/managers not permitted to vote). To the extent that Willmar's arguments have force, they can be raised at that stage. But the existence of that issue on the horizon is not in itself a reason to deny Hendrix the protection of the NLRA at the hiring stage.
 
 
 14
 Willmar also points to decisions such as NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), see also Lechmere, Inc. v. NLRB, --- U.S. ----, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992), carefully distinguishing between the right of union members who are employees to use employer property for their advocacy, and the much more limited rights of non-employees. We see no conflict. That Hendrix's employment would give him a better perch from which to propagandize is true, just as it would be true for any union zealot who got a job with Willmar. Willmar's reading of § 2(3) is quite unnecessary to prevent any anomaly on this score.
 
 
 15
 We hold, then, that the NLRB could reasonably determine that Hendrix or anyone else who is employed simultaneously by a union and a company is an "employee" under § 2(3) of the Act, leaving to another day the issue of when employment ties to a union establish such a risk of disloyalty that the (non-union) employer can reject or dismiss the union employee on that ground.
 
 
 16
 Accordingly, we deny Willmar's petition for review and grant the NLRB's cross-application for enforcement of its order.
 
 So Ordered
 
 
 [1]
 This exception completely undermines Willmar's claim that § 8(a)(2) of the NLRA, 29 U.S.C. § 158(a)(2) (1988), forbidding employer financial support of a union, and § 302 of the Labor Management Relations Act, forbid the employment of someone situated as Hendrix is. So long as Willmar gets a day's work for a day's pay out of Hendrix, it violates neither provision